Leo N. Swanson, Petitioner, v. State of Nebraska et al., Respondents.

271 N. W. 264

Filed January 25, 1937. No. 30064.

*Crofoot, Fraser, Connolly & Stryker,* for petitioner.

*William H. Wright, Attorney General,* and *Milton C. Murphy,* for respondents.

Heard before Goss, C. J., Rose, Good, Eberly, Day, Paine and Carter, JJ.

Carter, J.

This is an action brought under our declaratory judgments act by Leo N. Swanson for the purpose of determining his legal rights and official status after the purported adoption of an amendment to the Constitution of this state affecting the office of commissioner of public lands and buildings which he formerly held and to which he now claims to be entitled.

The record discloses that petitioner, at the general election held in November, 1934, was elected commissioner of

public lands and buildings for a two-year term commencing the first Thursday after the first Tuesday in January, 1935, and, after qualifying, entered upon the discharge of the duties of that office. At the election held in November, 1936, petitioner was a candidate for reelection to the same office and received a majority of the votes cast for the candidates for the office.

It also appears that the 1935 session of the legislature passed an act, known as House Roll No. 404, providing for the submission of a proposed amendment to section 1, art. IV of the Constitution, to the electorate of this state. Laws 1935, ch. 188. That part of section 1, art. IV of the Constitution, that is material in the consideration of this case is as follows: "The executive officers of the state shall be the governor, lieutenant governor, secretary of the state, auditor of public accounts, commissioner of public lands and buildings, treasurer, attorney general, superintendent of public instruction and the heads of such other executive departments as may be established by law." The effect of the proposed amendment to the above section of the Constitution was to remove therefrom the words "commissioner of public lands and buildings." The proposal thus submitted was voted upon by the electorate of Nebraska at the general election held in November, 1936, and, after a tabulation and canvass of the votes cast thereon, the governor, on December 15, 1936, by proclamation formally declared that "said proposed amendment is now in full force and effect as a law of the state and as a part of the Constitution of the state of Nebraska from the date of this proclamation." Pursuant to this proclamation, the petitioner, so far as possible, was deprived of the exercise of the powers incident to the office of commissioner of public lands and buildings, all compensation denied him from and after November 3, 1936, the date of the general election, and all of his official acts performed subsequent to that date refused and denied as legal and official acts by other officials charged with the administration of the governmental affairs of the state.

The first contention made by petitioner is that provisions for the amendment of the Constitution are mandatory and must be complied with, and that there was no substantial compliance with the requirements of section 1, art. XVI of the state Constitution, which provides that "such proposed amendments shall be entered on the journals, with the yeas and nays." The stipulation of facts shows that the title of the bill appears in the journal of each house of the legislature. The journals of each house further show that the yeas and nays were noted therein and that the constitutional requirement of a three-fifths vote in each house had been obtained. In *State v. Winnett*, 78 Neb. 379, 110 N. W. 1113, a case involving the point being considered, the court said: "The self-imposed limitations on the power of the people to amend their fundamental law should not be so construed as to defeat the will of the people, plainly expressed, on account of a slight and unimportant failure to comply literally with such limitations, if the requirements are substantially observed." Under the authority of this case, the journals of the two houses of the legislature show a substantial compliance with section 1, art. XVI of the Constitution, in so far as they affect House Roll No. 404.

It appears that there was not a strict compliance with that part of section 1, art. XVI of the Constitution, which provides that the proposed amendment shall be "published once each week for four weeks, in at least one newspaper in each county, where a newspaper is published, immediately preceding the next election of members of the legislature." The record shows that in one county of the state publications of the notice were not made on the correct dates; in three others, publications were not run the required number of times. In *State v. Cline*, 118 Neb. 150, 224 N. W. 6, this court said: "Nevertheless, where the Constitution itself prescribes certain procedure relative to an important element, as the giving and publication of notice, in the submission to the electors of a proposed amendment, there must be a substantial compliance with such requirements in order to effect either a valid submission or adop-

tion of the proposal." See, also, *In re Senate File 31,* 25 Neb. 864, 41 N. W. 981; *Weston v. Ryan,* 70 Neb. 211, 97 N. W. 347; *State v. Winnett, supra.* We therefore conclude that, under the authorities cited, the requirements of section 1, art. XVI of the Constitution, as to publication and notice of the amendment to the electorate of Nebraska, were substantially complied with and the petitioner's contentions to the contrary are without merit.

The petitioner next contends that the official canvass of the votes cast for and against the proposed constitutional amendment must be made by the legislature when it convenes in 1937, and that until such canvass is made and the result determined the amendment cannot become effective.

The respondents insist that an amendment to a constitutional provision takes effect as of the date of the election at which it was submitted, regardless of the method, time or means of ascertaining the result of the election. In support of this contention the attorney general cites the following cases: *State v. Winnett, supra; State v. Dean,* 84 Neb. 344, 121 N. W. 719; *In re Senate File 31, supra; Tecumseh Nat. Bank v. Saunders,* 51 Neb. 801, 71 N. W. 779. It will be noted that *State v. Dean, supra,* was decided on May 7, 1909, and that the other decisions referred to were of an earlier date. Due to constitutional changes since 1909, a construction of section 4, art. III, and section 1, art. XVI of the Constitution, will be determinative of the proposition now under consideration, and, to the extent that the same may be in conflict with the doctrine announced in the cases cited, necessarily supersedes the same.

Section 1, art. XVI, reads as follows: "Either branch of the legislature may propose amendments to this Constitution, and if the same be agreed to by three-fifths of the members elected to each house, such proposed amendments shall be entered on the journals, with the yeas and nays, and published once each week for four weeks, in at least one newspaper in each county, where a newspaper is published, immediately preceding the next election of members of the legislature. At such election said amendments shall

be submitted to the electors for approval or rejection upon a ballot separate from that upon which the names of candidates appear. If a majority of the electors voting on any such amendment adopt the same, it shall become a part of this Constitution, provided the votes cast in favor of such amendment shall not be less than thirty-five per cent. of the total votes cast at such election. When two or more amendments are submitted at the same election, they shall be so submitted as to enable the electors to vote on each amendment separately."

Section 4, art. III, so far as applicable to the present question, was first adopted in 1912, and is as follows: "A measure initiated shall become a law or part of the Constitution, as the case may be, when a majority of the votes cast thereon, and not less than thirty-five per cent. of the total vote cast at the election at which the same was submitted, are cast in favor thereof, and shall take effect upon proclamation by the governor which shall be made within ten days after the official canvass of such votes. The vote upon initiative and referendum measures shall be returned and canvassed in the manner prescribed for the canvass of votes for president. *The method of submitting and adopting amendments to the Constitution provided by this section shall be supplementary to the method prescribed in the article of this Constitution, entitled, 'Amendments' and the latter shall in no case be construed to conflict herewith."* (Italics ours.)

Webster's New International Dictionary defines "supplementary" as "Added as a supplement; additional; being, or serving as, a supplement."

In *McCleary v. Babcock,* 169 Ind. 228, 82 N. E. 453, that court, in discussing a supplemental act, says: "It is that which supplies a deficiency, adds to, or completes, or extends that which is already in existence, without changing or modifying the original. *State v. Board* (1897) 16 Ohio Cir. Ct. Rep. 218, 221; *Rahway Savings Institution v. Rahway* (1890) 53 N. J. Law, 48, 20 Atl. 756."

In *Rahway Savings Institution v. Rahway,* 53 N. J. Law,

48, 20 Atl. 756, Magie, J., says in part: "The ordinary meaning of the word 'supplement' doubtless is 'a supplying by addition of what is wanting.' A glance at our legislation from the time of the adoption of the constitutional provision will show that the word has constantly been used in a sense so broad as to possibly justify a claim that it has acquired thereby a special meaning broader than the ordinary one. But for the purposes of this case it is sufficient to say, that the ordinary meaning of the word will, under our construction of this clause, cover every species of amendatory legislation which goes to complete the legislative scheme."

So, also, "A supplemental act is one designed to improve an existing statute, by adding something thereto without changing the original text." *First State Bank v. Bottineau County Bank,* 56 Mont. 363, 185 Pac. 162, 8 A. L. R. 631.

The language of section 4, art. III, viz., "the method of * * * adopting amendments to the Constitution provided by this section shall be supplementary to the method prescribed in the article of this Constitution, entitled, 'Amendments,'" refers to section 1, art. XVI, already quoted herein.

In the constitutional provisions under consideration we have an example of a constitutional modification made by reference contained in a supplemental constitutional enactment. In principle, "legislation by reference" has been accorded unquestioned recognition by our precedents. *Richardson v. Kildow,* 116 Neb. 648, 218 N. W. 429; *Sheridan County v. Hand,* 114 Neb. 813, 210 N. W. 273; *State v. Moorhead,* 100 Neb. 298, 159 N. W. 412.

In dealing with cases of legislation by reference, it is obvious that the primary consideration to be kept in view is the general scope and object of the amending legislation. *Tracey v. Pretty & Sons* (1901) 1 Q. B. (Eng.) 444.

It is equally obvious that the proper rule of construction would be substantially the same when constitutional provisions of an identical nature are under consideration.

Therefore, it follows that the proper construction of the

above provision, already quoted from section 4, art. III of the Constitution, is, in legal effect, to supplement, to add to and incorporate in section 1, art. XVI, as though physically a part thereof, the following provisions contained in the former: That "the vote" on such amendment "shall be returned and canvassed in the manner prescribed for the canvass of votes for president," and "shall become a * * * part of the Constitution * * * when a majority of the votes cast thereon * * * are cast in favor thereof, and shall take effect upon proclamation by the governor which shall be made within ten days after the official canvass of such votes."

It will also be noted that the provisions quoted, essentially a constitutional mandate, supersede and set aside all conflicting legislative provisions.

It follows that the official canvass made by the board of canvassers properly determined the result of the election, and the amendment first became effective on the date and as proclaimed by the governor. Up to that time, the powers, privileges, rights and duties of the commissioner of public lands and buildings were, and could be, in no manner affected or modified.

The only question remaining is a determination of the effect of the constitutional amendment after it became a part of the Constitution of the state.

Preliminary to the consideration of the effect of the constitutional amendment before us, it is to be remembered, "In creating a legislative department and conferring upon it the legislative power, the people must be understood to have conferred the full and complete power as it rests in, and may be exercised by, the sovereign power of any country, subject only to such restrictions as they may have seen fit to impose, and to the limitations which are contained in the Constitution of the United States. The legislative department is not made a special agency for the exercise of specifically defined legislative powers, but is entrusted with the general authority to make laws at discretion. * * * 'It has never been questioned, so far as I know,' says Redfield,

Ch. J., 'that the American legislatures have the same unlimited power in regard to legislation which resides in the British Parliament, except where they are restrained by written Constitutions. That must be conceded, I think, to be a fundamental principle in the political organizations of the American states. We cannot well comprehend how, upon principle, it should be otherwise. The people must, of course, possess all legislative power originally. They have committed this in the most general and unlimited manner to the several state legislatures, saving only such restrictions as are imposed by the Constitution of the United States, or of the particular state in question.'" 1 Cooley, Constitutional Limitations (8th ed.) 175, 177.

The principles above enunciated have long been approved in this jurisdiction, and we are fully committed to the doctrine that the Constitution of this state is not a grant but a restriction on legislative power, and that the legislature may legislate upon any subject not inhibited by the Constitution. *Hallenbeck v. Hahn,* 2 Neb. 377; *State v. Lancaster County,* 4 Neb. 537; *State v. Dodge County,* 8 Neb. 124; *Shaw v. State,* 17 Neb. 334; 22 N. W. 772; *Magneau v. Fremont,* 30 Neb. 843, 47 N. W. 280; *State v. Moorhead,* 99 Neb. 527, 156 N. W. 1067.

This necessarily includes the proposition that, subject to limitations and restrictions expressly imposed by constitutional provisions, the power to create or continue an office is vested in the legislative department of government. 46 C. J. 933; 23 Am. & Eng. Ency. of Law (2d ed.) 328.

Prior to the adoption of the constitutional amendments of 1920, the executive department was strictly defined and the officers composing it strictly limited to those enumerated in section 1, art. V of the Constitution of 1875. Section 26, art. V, provided: "No other executive state office shall be continued or created, and the duties now devolving upon officers not provided for by this Constitution shall be performed by the officers herein created."

The conclusion of this court as to the effect of those provisions was that "the creation of an executive state office,

or the providing for the election or appointment of an executive state officer not provided for in said article, could not well have been more clearly inhibited." *In re Railroad Commissioners,* 15 Neb. 679, 50 N. W. 276.

However, the public policy established in these constitutional provisions was, in 1920, substantially and radically modified. The attempt to constitutionally define the executive department of the state, and definitely enumerate those who constituted it, was abandoned. Section 1, art. IV of the new Constitution, provided: "The executive officers of the state shall be (here follows enumeration) * * * *and the heads of such other executive departments as may be established by law."* (Italics ours.)

By these amendments the inhibitory powers previously inherent in these constitutional provisions practically ceased to exist.

Taking up the consideration of the amendment here involved, in the light of the foregoing discussion, it will be noted that the amendment in question first appears as House Roll No. 404, adopted by both houses of the legislature of 1935, and approved May 27, 1935. Conforming to the form of an ordinary legislative enactment, it was drafted with a title, a purview, and an enacting clause, with the second paragraph of the enactment providing for its submission at the general election in November, 1936, to the voters for their approval or rejection. The restrictive title employed was "An act for a joint and concurrent resolution to amend section 1, art. IV, Constitution of the state of Nebraska, 1875, * * * and to abolish the office of commissioner of public lands and buildings." Considering it as a statute would be considered, in view of section 14, art. III of the Constitution, providing that no bill shall contain more than one subject, and that the same shall be clearly expressed in the title, the import of the amendment would be strictly restricted in its application to the section of the Constitution named therein, and thus would be necessarily limited by the form in which it was enacted.

However, while considering a similar question then be-

fore this court, in reply to an interrogatory relative to the effect of a claimed defective title of "A bill for an act to submit to the electors of the state, for rejection or approval, an amendment," Maxwell, J., in the case of *In re Senate File 31, supra,* stated: "In answer to the fourth interrogatory, we will say that no title is necessary to a proposed amendment or amendments to the Constitution, *and if a title has been inserted it may be treated as null and void.* A proposition to amend the Constitution, when adopted by the necessary three-fifths votes of all the members elected to each house, is in no sense a law. It is a mere proposal, based, it is to be presumed, upon a public demand for its submission, but it will possess no validity until ratified by a majority of all the votes cast at the election. If two or more propositions are submitted, they are to be submitted separately. There is a good reason why but one subject should be embraced in a bill designed to become a law by action of the legislature and governor, and that the subject should be clearly expressed in the title, as without such condition experience has shown that provisions of a very objectionable character, which there was no possibility of passing independently, were attached to meritorious bills and smuggled through, or knowingly voted for by members to prevent the defeat of meritorious measures. In other words, as said by this court in *White v. City of Lincoln,* 5 Neb. 505, the object 'is to prevent surreptitious legislation by incorporating into a bill obnoxious provisions which have no connection with the general object of the bill, and of which the title gives no indication.' No such reasons obtain, however, in submitting a proposition to amend the Constitution, and the provisions of the Constitution are not applicable thereto." (Italics ours.)

The conclusion follows that "the title" that accompanied House Roll No. 404, during its legislative existence, is "null and void" and surplusage, and formed no part of the proposed amendment ultimately submitted for adoption. It was evidently so properly considered by the authorities charged with the publication thereof, because the record

now here presented discloses that the title constituted no part of the amendment as actually published pursuant to section 1, art. XVI.

The text so actually submitted was as follows: "Section 1. The executive officers of the state shall be the governor, lieutenant governor, secretary of the state, auditor of public accounts, treasurer, attorney general, superintendent of public instruction and the heads of such other executive departments as may be established by law. The legislature may provide for the placing of the above named officers as heads over such departments of government as it may by law create. The governor, lieutenant governor, attorney general, secretary of state, auditor of public accounts, and treasurer shall be chosen at the general election held in November, 1922, and in each even numbered year thereafter, and their term of office shall be two years and until their successors shall be elected and qualified. The superintendent of public instruction shall be elected in November, 1922, and every four years thereafter, and his term of office shall be four years and until his successor shall be elected and qualified. The records, books and papers of all executive officers shall be kept at the seat of government, and such officers, excepting the lieutenant governor, shall reside there during their respective terms of office. Officers in the executive department of the state shall perform such duties as may be provided by law. The heads of all executive departments established by law, other than those to be elected as provided herein, shall be appointed by the governor, with the consent of a majority of all the members elected to the legislature, but officers so appointed may be removed by the governor. Subject to the provisions of this Constitution, the heads of the various executive or civil departments shall have power to appoint and remove all subordinate employees in their respective departments."

A careful examination of the amendment thus submitted and adopted discloses that what was actually done and accomplished was so clear and certain as to preclude construction, so far as the question here presented for con-

sideration is concerned. It effected the deletion of the words "commissioner of public lands and buildings" from section 1, art. IV of the state Constitution, as theretofore existing. The new section 1, art. IV, created by this amendment, upon its adoption became a new, complete section of the Constitution, as much so as if originally incorporated in the Constitution, and is to be construed accordingly. If possible, it must be harmonized with all the other provisions of the Constitution. 1 Cooley, Constitutional Limitations (8th ed.) 129. The well-recognized rule applicable is that effect must be given, if possible, to the whole instrument and to every section and clause, in the light of the historical development of the principle involved and contained therein. The Constitution as amended must be construed as a whole.

The following statement of the rule under discussion has received approval in this jurisdiction: "A constitutional amendment becomes an integral part of the instrument and must be so construed. It must be harmonized, if possible, with all other provisions, and effect must be given to every section and clause as well as the whole instrument." *Luikart v. Higgins*, 130 Neb. 395, 264 N. W. 903. See, also, *Hooper Telephone Co. v. Nebraska Telephone Co.*, 96 Neb. 245, 147 N. W. 674.

It will also be remembered that, while a clause in a constitutional amendment will prevail over a provision in the original instrument inconsistent with the amendment, "distinct constitutional provisions are repugnant to each other only when they relate to the same subject, are adopted for the same purpose, and cannot be enforced without substantial conflict." 12 C. J. 709.

So, also, it is a well-recognized canon of construction that, "when general and special provisions of a Constitution are in conflict, the special provisions should be given effect to the extent of their scope, leaving the general provisions to control in cases where the special provisions do not apply." 12 C. J. 709.

It must also be remembered that, while it is the duty of

the courts to ascertain and carry into effect the intent and purpose of the framers of a Constitution, or of an amendment thereto, duly adopted, this intent must be that which they have embodied in the instrument itself. 12 C. J. 703.

In *State v. De Lorenzo,* 81 N. J. Law, 613, 79 Atl. 839, it is stated: "The existence of a constitutional limitation upon the legislative power is to be established and defined by words that are found written in that instrument, and not by reference to some spirit that is supposed to pervade it or to underlie it or to overshadow the purposes and provisions expressed in its written language."

Further, in *People v. City Council of Denver,* 60 Colo. 370, 153 Pac. 690, we find this language: "In other words, in construing a constitutional provision, for the purpose of ascertaining the intent of the people in adopting it, when its language is explicit, the courts are bound to seek for the intention in the words of the provision itself, and they are not to suppose or hold that the people intended anything different from what the meaning of the language employed imports."

The foregoing part of this opinion to a large extent states the expressed views of Mr. Justice Eberly.

The intent of the people in adopting the amendment before us will be determined in the light of the foregoing discussion. It must be borne in mind that, while the amendment is an integral part of the Constitution, the original provision actually remains as a part of the Constitution for purposes of construction. It is therefore possible to consider the original section as well as the amendment to determine the intent of the people in adopting the amendment. In the original section the name of "commissioner of public lands and buildings" was listed among the other executive officers of the state that were specifically named. The adopted amendment is in the exact language of the original section except that the name "commissioner of public lands and buildings" is left out. We are of the opinion that these facts indicate a clear intent to eliminate the commissioner of public lands and buildings as a consti-

tutional executive officer of this state. There certainly can be no presumption that the people of this state did not intend to accomplish something by adopting the amendment. It is the duty of this court, in construing the effect of what was done, to give the amendment the most favorable intendment that can be gleaned from a construction of all of the provisions of the Constitution after the adoption of the amendment. "A constitutional provision therefore should not be construed so as to defeat its evident purpose, but rather so as to give it effective operation, and suppress the mischief at which it was aimed." 6 R. C. L. 50, sec. 45.

In *School District v. City of Pontiac,* 262 Mich. 338, 247 N. W. 474, the court in a like situation said:

"We are asked to construe in certain particulars this amendment to the Constitution. Unfortunately it is couched in language so ambiguous that able counsel after much study and reflection are far from being in accord as to its proper construction. Even some of those who were instrumental incident to initiating the amendment seem to differ widely as to what was to be accomplished thereby. Because of such ambiguity, it becomes the duty of the court to construe the amendment as worded in the light of established rules for the construction of constitutional provisions. Much has already been written concerning proper rules for such construction. Extended review of these rules would not be particularly helpful. Fortunately the pertinent fundamental guides for such construction have been clearly and concisely stated in former decisions of this court:

" 'It is a maxim that the object of construction, as applied to a written Constitution, is to ultimately ascertain and give effect to the intent of the people in adopting it. * * *

" 'In construing constitutional provisions where the meaning may be questioned, the court should have regard to the circumstances leading to their adoption and the purpose sought to be accomplished.' *Kearney v. Board of State Auditors,* 189 Mich. 666."

We conclude therefore that the intent of the people, as shown within the four corners of the Constitution itself, was to remove the commissioner of public lands and buildings from the list of executive state officers named in the Constitution. Such an intent being apparent, other provisions of the Constitution in conflict with the latest expression of the public will, under recognized rules of construction hereinbefore expressed, must be treated as superseded by the amendment and harmonized with it in order to accomplish the intent of the electorate as determined from an examination of the Constitution and the adopted amendment. We necessarily conclude that, on and after the governor's proclamation of December 15, 1936, the office of commissioner of public lands and buildings ceased to be a constitutional office in this state.

The question immediately arises whether the office of commissioner of public lands and buildings was completely abolished by the constitutional amendment. It will be noted that the amendment contains no specific words purporting to abolish the office. We fail to find any language from which such an intent can be implied. The removal of the name of "commissioner of public lands and buildings" from the list of constitutional executive officers of the state certainly cannot of itself amount to an abolition of the office unless reasonable intendments of that nature can reasonably be drawn from what was done.

It is quite apparent that executive officers of the state can exist without being specifically named in the Constitution. The very section amended, section 1, art. IV, specifically provides for other executive state officers when it states "and the heads of such other executive departments as may be established by law." It must be presumed that the people of the state had this provision in mind when they voted upon the amendment. At the time the amendment was voted upon, the commissioner had many duties to perform that were impressed upon him by legislative action. Section 84-401, Comp. St. 1929, provides: "The commissioner of public lands and buildings shall perform

such duties as may be devolved upon him by law and as provided by section 1 of article VII of the Constitution." Sections 84-402 to 84-411, inclusive, Comp. St. 1929, place duties and burdens upon the office of commissioner of public lands and buildings, all as a result of legislative action only. Section 72-201, Comp. St. Supp. 1935, provides for a secretary of the board of educational lands and funds and specifically states that the commissioner of public lands and buildings or some other member of the board may be such secretary. By this statute, the legislature clearly designates the commissioner of public lands and buildings as a member of the board of educational lands and funds. Section 72-707, Comp. St. 1929, makes and constitutes the commissioner of public lands and buildings the custodian of the state capitol and capitol grounds, including numerous official duties therein enumerated, all of which was done by legislative action. Many other sections of our statutory law impose duties upon the commissioner of public lands and buildings that we will not mention. We fail to find any logic in the argument that the mere removal of the name of the commissioner of public lands and buildings from the list of constitutional officers would, under the circumstances of this case, viewed in the light of the provisions of the Constitution itself after the amendment was adopted, by implication repeal all of the acts of the legislature hereinbefore mentioned.

It is true that the legislature never has, so far as we can determine, by express terms created the nonconstitutional office of commissioner of public lands and buildings. However, it has been held in many jurisdictions that, "in creating an office no particular language is necessary, it being sufficient if the intent of the legislature is manifested by the language used." 46 C. J. 934. In *Childs v. State,* 4 Okla. Cr. 474, 113 Pac. 545, the court said: "It is not necessary to the creation of an office that the legislature declare in express words that such office is created. The use of any language which shows the legislative intent to create the office is sufficient." We must presume that the

people, in amending the Constitution, had in mind the fact that many existing statutes were in force placing duties and obligations upon the commissioner of public lands and buildings. In view of the fact that the amendment contained no language from which an intent can be drawn to abolish the office in its entirety or to repeal existing statutory law pertaining to the office, which said statutory law standing alone is sufficient to create the office of commissioner of public lands and buildings, we must necessarily conclude that the office is still existent as an executive office of the state with the duty imposed of performing all functions required of him by the statutes of this state. The amendment under consideration is clearly self-executing to the extent of depriving the office of its constitutional character. But, to accomplish the complete abolition of the office, further legislative action in that direction will be required subject only to constitutional limitations placed upon the legislature with reference thereto.

We therefore conclude that the amendment was properly submitted and adopted as a part of the Constitution by the electorate of Nebraska; that, by virtue thereof and the proclamation of the governor, the office of commissioner of public lands and buildings ceased to be a constitutional office on and after December 15, 1936; that a construction of the Constitution after the adoption of the amendment in question requires this court to hold that the office of commissioner of public lands and buildings continued as an executive state office thereafter; that the official acts of the petitioner since November 3, 1936, are those of a regularly elected and qualified executive officer of the state; that petitioner is entitled to his salary for the term for which he was elected, as fixed at the time of his election; and that the appropriation of funds for carrying out the duties of his office is a valid and subsisting appropriation.

JUDGMENT ACCORDINGLY.

ROSE and EBERLY, JJ., dissenting.

Not being in agreement with that part of the opinion adopted by the majority of this court which adjudges that

the amendment to section 1, article IV of the Constitution, adopted in 1936, was effective to totally abolish the constitutional existence of the office of commissioner of public lands and buildings, we respectfully dissent therefrom, and, in support of our position, submit the following:

The text of section 1, article IV of our Constitution, as now amended, is set forth in the majority opinion and will not be repeated here. This section was the only section submitted to the electorate for the purpose of amendment, and, so far as here involved, the sole amendment attempted was the deletion therefrom of the words, "Commissioner of Public Lands and Buildings." It was a repeal by omission, and no more. *State v. McCafferty,* 25 Okla. 2, 105 Pac. 992; *Adams County v. Scott,* 117 Wash. 85, 200 Pac. 1112; *Spokane & Eastern Trust Co. v. Hart,* 127 Wash. 541, 221 Pac. 615.

The following sections of our Constitution were never submitted to the people at the election of 1936 for the purpose of amendment, and never expressly repealed, and still remain an integral part of our fundamental law, viz.:

"The governor, secretary of state, treasurer, attorney general, and commissioner of public lands and buildings shall, under the direction of the legislature, constitute a board of commissioners, for the sale, leasing, and general management of all lands and funds set apart for educational purposes, and for the investment of school funds, in such manner as may be prescribed by law." Const. art. VII, sec. 1.

"If the office of * * * commissioner of public lands and buildings, * * * shall be vacated by death, resignation or otherwise, it shall be the duty of the governor to fill the same by appointment, and the appointee shall hold his office until his successor shall be elected and qualified in such manner as may be provided by law." Const. art. IV, sec. 21.

Sections 3, 4, and 5, of article XVII, provide for the salary of the "Commissioner of Public Lands and Buildings," for his biennial election, and for his term of office. In ad-

dition, section 6 of this article provides: "The legislature shall pass all laws necessary to carry into effect the provisions of this Constitution."

The rule this situation invokes we quote from the opinion of the majority, which they approve but fail to follow, viz.:

"A constitutional amendment becomes an integral part of the instrument and must be so construed. It must be harmonized, if possible, with all other provisions, and effect must be given to every section and clause as well as the whole instrument." *Luikart v. Higgins,* 130 Neb. 395, 264 N. W. 903. See, also, *Hooper Telephone Co. v. Nebraska Telephone Co.,* 96 Neb. 245, 147 N. W. 674; Cooley, Constitutional Limitations (8th ed.) 129.

It is obvious that there is nothing in section 1, article IV, as amended, which is in any manner in conflict with or repugnant to the several sections of the Constitution already quoted herein.

If, then, we fairly apply the rule above quoted to the situation now confronting us, the conclusion inescapably follows that the commissioner of public lands and buildings remains a constitutional officer within the terms of the definition, viz., "Any of those officers whose tenure and term of office are fixed and defined by the Constitution." 12 C. J. 1294. See, also, *Foster v. Jones,* 79 Va. 642, 644. His office, therefore, still remains a constitutional office. Constitutional offices are "offices which, as contradistinguished from legislative or statutory offices, are denominated constitutional, such as are governmental in their nature, as for example the executive, judicial, or legislative offices of the state or any political division thereof. All these are either created by or provided for in the Constitution." 12 C. J. 1294. See, also, *People v. Scheu,* 60 App. Div. 592, 69 N. Y. Supp. 597.

In this connection, this court has construed section 1, article VII, in the following language: "By section 1, article 8, of the state Constitution (now Const. art. VII, sec. 1) the sole power to manage, loan, and invest the perma-

nent school funds of the state is lodged with a board .composed of the governor, secretary of state, treasurer, attorney general, and commissioner of public lands and buildings; and said board cannot be deprived of its functions by legislative enactment, nor can the legislature confer authority upon a single member of said board, or any other person, to invest any portion of said trust funds." *State v. Bartley*, 40 Neb. 298, 58 N. W. 966. See, also, *State v. Bartley*, 41 Neb. 277, 59 N. W. 907.

Thus, there are vested in the members of this board constitutional functions of a special nature, not subject to termination by legislative action, which they as members of the board are constitutionally required to carry out and perform. In view of the constitutional duties thus entailed on them, and the capacities in which they are performed, they must be deemed constitutional officers. The nature of the duties so imposed confers the distinction which their performance involves. The principle here involved is illustrated in *People v. Hogan*, 214 N. Y. 216, 108 N. E. 459. The following excerpt therefrom discloses the situation and the controlling application of this principle as made by the highest court of review of that state, in answer to the question:

"Is a member of the board of aldermen of the city of New York a constitutional officer? We think he is, and for reasons which can be briefly stated.

"In the city of New York the power of apportioning the counties thereof into assembly districts is vested in 'the common council, or if there be none, the body exercising the powers of a common council.' Const. art. III, sec. 5. That the board of aldermen is the body exercising the powers of a common council cannot be doubted. The Greater New York charter provides: 'The legislative power of the city of New York, except as otherwise herein provided, shall be vested in one house to be known and styled as the "Board of Aldermen of the City of New York."' Laws of 1901, ch. 466, sec. 17. In the absence of boards of supervisors— and there are no such boards in the counties making up

the city of New York—there *must* be a 'body exercising the powers of a common council' to perform the mandate of the Constitution in respect to legislative apportionment. This function is one of supreme importance in the government of the state. Its importance is emphasized by the introduction into the Constitution itself of a provision for the judicial review thereof, requiring that 'any court before which a cause may be pending involving an apportionment, shall give precedence thereto over all other causes and proceedings, and if said court be not in session it shall convene promptly for the disposition of the same.' Const. art. III, sec. 5. The board of aldermen of the city of New York, thus being the body upon which the Constitution has devolved this most responsible duty, so far as assembly districts are concerned, is a constitutional body, so long as it remains vested with this power of apportionment, and the aldermen who constitute the board are necessarily constitutional officers. The fact that they may cease to be such if the legislature should transfer the powers of a common council from them to some other body does not affect the question before us."

It was accordingly adjudged that, as to election and tenure of office, the rights involved were determinable as of constitutional officers of the state of New York.

So, too, we believe the majority opinion correctly proceeds on the basis that, since the amendments of 1920 to sections 1 and 27 of article IV, the language of the section 1 here under consideration may no longer be deemed exclusionary. It also clearly appears that the constitutional powers vested in the commissioner of public lands and buildings, as a member of the board of commissioners for educational lands and funds, and the constitutional capacity created thereby, are vested exclusively by the terms of section 1, article VII, and in no manner derived from, or find their source in, section 1, article IV. It follows, therefore, that the repeal of all or a part of the latter section in no manner affects the powers created and vested by the terms of the former.

Furthermore, we are unable to accept the contention set forth in the majority opinion that all the constitutional provisions heretofore referred to herein as necessitating the continuance of the office of commissioner of public lands and buildings as a constitutional office were, though not within the express terms of the purview of the amendment, repealed by implication.

The maxim *"leges posteriores priores contrarias abrogant"* is one that has come to us as part of our heritage of English law. That it is equally controlling as applied to conflicting statutory or conflicting constitutional enactments may be conceded. But the facts in the instant case do not bring it within the scope of the maxim. So far as involved in the present case, what was submitted to and voted on by the electorate was a proposition to repeal a portion of section 1, article IV, by omission of the words "Commissioner of Public Lands and Buildings." The proposition was carried and the deletion was made and the repeal accomplished.

Now, as two bodies may not occupy the same space at the same time, so the force of the controlling maxim is that two affirmative inconsistent or repugnant acts covering the same subject may not coexist. But an amendment solely by omission is in substance a simple unconditional repeal of that which the omission discloses. A simple repeal is not affirmative. It terminates an affirmation. When this is accomplished, its function is performed. It ceases to be. There can be nothing inconsistent or repugnant to what is absolutely repealed. Therefore, a repeal by simple, express and definite omission affords no basis for other or further repeals by implication. This conclusion is in harmony with the true interpretation of the controlling maxim, as disclosed by the precedents of centuries. Assuming it to be equally applicable to constitutional enactment, and as limited to the question presented in this case, the proper statement of the rule is: "Every affirmative statute is a repeal by implication of a precedent affirmative

statute, so far as it is contrary thereto." Beal, Cardinal Rules of Legal Interpretation (2d ed.) p. 471.

The essential basis of affirmative law or enactment, as a prerequisite to a repeal by implication, was recognized by the English courts as early as *Dr. Foster's Café,* 6 Coke Rep. 56. Indeed, the principle finds still earlier approval. See, 7 Bac. Abr. Statute (D) p. 442. See, also, *Ex parte Warrington* (1853) 3 D. M. & G. *159, at p. *171; *Hill v. Hall* (1876) 1 Ex. D. 411, at pp. 413, 414; *Garnett v. Bradley* (1878) 3 App. Cas. 944, at pp. 965, 966. The American authorities, while not emphasizing the principle, disclose no substantial departure from it.

It follows that, both in form and substance, the proposed amendment was wholly insufficient to sustain any further or additional repeals by implication, and the several sections of the Constitution heretofore enumerated, and not expressly repealed, remain in full force and effect.

Indeed, the better view, therefore, seems to be that a proposition to so amend the Constitution as to abolish the office of commissioner of public lands and buildings should submit to the voters a definite, understandable provision. It should not require a voter to discern in advance an effect which, if the proposition is adopted, would confound lawyers, lawmakers, executive officers and courts. The proposition to change the Constitution by abolishing the office of commissioner of public lands and buildings was directed solely to a single section thereof, and the proposal was limited to the elimination of that office. There was no expressed purpose in the text submitted to the voters to change any other provision of the Constitution. Unchanged sections thereof left the office of commissioner of public lands and buildings and the substantial constitutional duties of the commissioner undisturbed. If these are the better views, it follows that the abolishing proposal submitted to the voters November 3, 1936, was ineffective for any substantial purpose whatever, and the judgment should so declare.