WARREN R. MILLER, SR., AND HILDA B. MILLER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5332–66, 1529–67.   Filed February 17, 1969.

Warren R. Miller, Sr., pro se.
*James F. Hart*, for respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioners' Federal income tax for the taxable years 1962 and 1963 (docket No. 5332–66) in the amounts of $609.60 and $692.76, respectively, and for the taxable years 1964 and 1965 (docket No. 1529–67) in the amounts of $512.95 and $375.14, respectively. Certain issues have been settled by the parties. The issues remaining for decision all relate to computation of the amount of retirement income credit to which petitioners are entitled under section 37 :[1]

(1) Whether capital was a material income-producing factor in petitioner's real estate brokerage business;

(2) Whether "earned income" for the purpose of computing the limitation on the amount of retirement income should be determined by reference to the net profits or the gross commissions from petitioner's business; and

(3) Whether petitioner Hilda B. Miller's community portion of the retirement income should be reduced by her community share of the "earned income" derived from the real estate brokerage business.

FINDINGS OF FACT

Petitioners Warren R. Miller, Sr., and Hilda B. Miller, husband and wife, were legal residents of Dallas, Tex., at the time their petition was filed. They filed joint Federal income tax returns for the taxable years 1962 to 1965, inclusive, with the district director of internal revenue at Dallas, Tex.

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

Warren R. Miller, Sr. (hereinafter petitioner), was born on October 23, 1906, and Hilda B. Miller was born on June 29, 1902. They were married in August of 1937.

Petitioner served in the U.S. Air Force from June 1927 until August 31, 1947, at which time he was honorably discharged. He then became eligible for retirement income under the Air Force retirement system and received benefits therefrom during the years here in controversy as follows:

| Year | Total received | Community half to each spouse |
|---|---|---|
| 1962 | $3, 571. 80 | $1, 785. 90 |
| 1963 | 3, 623. 85 | 1, 811. 92 |
| 1964 | 3, 780. 00 | 1, 890. 00 |
| 1965 | 3, 835. 44 | 1, 917. 72 |

During petitioner's service in the Air Force his earned income exceeded $600 per year for a period of more than 10 years. Hilda worked as a civil service employee at Wright-Patterson Air Force Base (then Patterson Field), Dayton, Ohio, from July 1921 to July 1942 and her earned income also exceeded $600 per year for more than 10 years.

In 1947 petitioner entered the real estate brokerage business as a sole proprietor. During the years 1962 to 1965, inclusive, he regularly employed from two to six real estate salesmen who worked on a part-time basis. Petitioner retained 50 percent of all real estate commissions earned on transactions handled by them; in addition, he sold real estate for his own account and retained 100 percent of the commissions earned on such transactions. The commission rate was usually 5 percent of the sales price. The following table shows the gross commissions retained by petitioner after compensating his salesmen, the deductible business expenses incurred, and the net profit or loss from the business for each of the years in issue:

| Year | Gross commissions | Deductible expenses | Net profit (or loss) |
|---|---|---|---|
| 1962 | $10, 820. 00 | $6, 983. 40 | $3, 836. 60 |
| 1963 | 14, 490. 00 | 11, 110. 00 | 3, 380. 00 |
| 1964 | 10, 713. 75 | 9, 575. 00 | 1, 138. 75 |
| 1965 | 5, 274. 00 | 5, 410. 50 | (136. 50) |

The expenses were incurred for such items as advertising, photographs, secretarial services, telephone and other utilities, telephone-answering service, automobile operation and depreciation, insurance, taxes, and other office expenses.

Petitioner owned a lot and building, used for his office, in which he had a total investment of $4,150, the fair market value of the property being approximately $11,000 in 1962 and $14,000 in 1965. He had also invested about $500 in his office furniture and equipment, and his 1962-model Chevrolet automobile had cost about $2,700. In

addition, he owned a lot on a principal street with a cost of $2,975; by maintaining a "for sale" sign on this lot, showing his name and telephone number, petitioner received incidental real estate business.

Petitioner's real estate business consisted of soliciting listings of property, locating potential buyers, persuading them to buy the properties, and handling the closings. Although the salesmen employed by him performed some of these services, petitioner closed the majority of the sales.

Petitioners claimed in their joint Federal income tax returns retirement income credits under section 37 in the amounts of $609.60 for 1962, $609.60 for 1963, $485.52 for 1964, and $394.20 for 1965.

In his notices of deficiency, respondent determined that the retirement income credits claimed by petitioners for 1962 through 1965, inclusive, were not allowable (except to the extent of $19.05 in 1965) because their gross real estate brokerage commissions, without any adjustment for deductible expenses, constituted earned income and exceeded the maximum allowable retirement income.

### OPINION

Section 37 [2] grants to an individual receiving taxable retirement income a credit against his tax liability equal to a specified percentage of his retirement income. A person receiving military retirement benefits, regardless of age, may apply the credit against the tax on his income. To qualify for the credit an individual is required to have had earned income in excess of $600 in any 10 prior calendar years. Under section 37(d)(2), in the case of an individual who has not

[2] The pertinent provisions of sec. 37, applicable to taxable years beginning after Dec. 31, 1963, are as follows:

(a) GENERAL RULE.—In the case of an individual who has received earned income before the beginning of the taxable year, there shall be allowed as a credit against the tax imposed by this chapter for the taxable year an amount equal to 17 percent, in the case of a taxable year beginning in 1964, or 15 percent, in the case of a taxable year beginning after December 31, 1964, of the amount received by such individual as retirement income (as defined in subsection (c) and as limited by subsection (d)); but this credit shall not exceed such tax reduced by the credits allowable under section 32(2) (relating to tax withheld at source on tax-free covenant bonds), section 33 (relating to foreign tax credit), and section 35 (relating to partially tax-exempt interest).

(b) INDIVIDUAL WHO HAS RECEIVED EARNED INCOME.—For purposes of subsection (a), an individual shall be considered to have received earned income if he has received, in each of any 10 calendar years before the taxable year, earned income (as defined in subsection (g)) in excess of $600. A widow or widower whose spouse had received such earned income shall be considered to have received earned income.

(c) RETIREMENT INCOME.—For purposes of subsection (a), the term "retirement income" means—

*       *       *       *       *       *       *

(2) in the case of an individual who has not attained the age of 65 before the close of the taxable year, income from pensions and annuities under a public retirement system (as defined in subsection (f)),

to the extent included in gross income without reference to this section, but only to

attained the age of 62 before the close of the taxable year, his "retirement income" must be reduced by his "earned income" in excess of $900 received in the taxable year; if he has attained the age of 62, his retirement income must be reduced by one-half of his earned income in excess of $1,200 but not in excess of $1,700 and the full amount of the earned income in excess of $1,700. Under section 37(g), the term "earned income" is to have "the meaning assigned to such term in section 911(b), except that such term does not include any amount received as a pension or annuity."

Section 911(b)[3] defines "earned income" to include "wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered." This section further provides that in the case of a taxpayer engaged in a trade or business "in which both personal services and capital are material income-producing factors," an amount not in excess of 30 percent of the "net profits" of the business shall be considered "earned income."

Petitioner advances three arguments to support his position that respondent's determination is erroneous: (1) That, for the purpose of applying the section 37(d)(2) limitation on the amount of retirement income, capital was a material income-producing factor in his real

---

the extent such income does not represent compensation for personal services rendered during the taxable year.

(d) LIMITATION ON RETIREMENT INCOME.—For purposes of subsection (a), the amount of retirement income shall not exceed $1,524 less—

\* \* \* \* \* \* \*

(2) in the case of any individual who has not attained age 72 before the close of the taxable year—

(A) if such individual has not attained age 62 before the close of the taxable year, any amount of earned income (as defined in subsection (g)) in excess of $900 received by such individual in the taxable year, or

(B) if such individual has attained age 62 before the close of the taxable year, the sum of (i) one-half the amount of earned income received by such individual in the taxable year in excess of $1,200 but not in excess of $1,700, and (ii) the amount of earned income so received in excess of $1,700.

For the years 1962 and 1963, the credit under subsec. (a) is an amount equal to the retirement income "multiplied by the rate provided in sec. 1 for the first $2,000 of taxable income." Sec. 37(b) as amended by Pub. L. No. 299, 84th Cong., 1st Sess., approved Aug. 9, 1955, extended the retirement credit to individuals, regardless of age, receiving benefits under a retirement system established for members of the Armed Forces of the United States.

[3] SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES

(b) DEFINITION OF EARNED INCOME.—For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producing factors, under regulations prescribed by the Secretary or his delegate, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income.

estate business, with the result that his earned income was only 30 percent of the net profits of such business; (2) alternatively, that, for the purposes of applying the section 37(d)(2) limitation, the *net* profits of his real estate business, rather than the *gross* commissions therefrom unadjusted for deductible expenses, constituted his earned income; and (3) that, in any event, in computing the retirement income credit the earned income should all be attributed to him, with the result that a credit would be allowed as to Hilda's community share of the retirement income even if a credit were denied as to his share.

Despite petitioner's investment in an office building, an automobile, and a vacant lot, and his substantial business expenses, capital was not a material income-producing factor in his real estate businesss within the meaning of section 911(b). The concept in that section of a "trade or business in which both personal services and capital are material income-producing factors" is not unique. Analogous language appeared in section 200 of the Revenue Acts of 1918 and 1921, relating to personal service corporations; 1939 Code section 25(a)(4), containing definitions for the computation of an earned-income credit; section 704(e)(1), relating to family partnerships; and section 1361 (b)(4) (now repealed), dealing with unincorporated enterprises electing to be taxed as domestic corporations. See *Fred J. Sperapani*, 42 T.C. 308, 334 (1964). Decisions applying these statutes make it clear that if, as in the present case, capital is utilized merely to pay the cost of salaries, wages, office space, and general business expenses, it is not a material income-producing factor but is only incidental to the production of the income. See, e.g., *Edward P. Allison Co.* v. *Commissioner*, 63 F. 2d 553, 558 (C.A. 8, 1933), affirming 22 B.T.A. 1371 (1931); *Alexander & Garret* v. *United States*, 21 F. 2d 547, 549 (S.D. Ga. 1927); *Fred J. Sperapani, supra*, and cases cited at 334. We think petitioner's income from the real estate brokerage business was attributable principally to his business reputation and sales and marketing ability. Cf. *Fred C. Sanborn*, 19 B.T.A. 495, 498 (1930); see also *Howard T. Lewis, Jr.*, 42 T.C. 885, 893–894 (1964). Accordingly, his earned income from the business is not subject to the 30 percent of net profits limitation prescribed by section 911(b).

Petitioner's second contention—that his earned income for the purposes of the section 37(d)(2) limitation consisted of the net profits rather than the gross commissions from his real estate business—presents a much more difficult problem. Respondent's determination used the gross figures in applying the section 37(d)(2) limitation and thereby completely eliminated petitioners' claimed retirement credit (except for $19.05 in 1965).

To support his determination respondent cites only section 1.37–2 (a), Income Tax Regs., which provides that, for the purposes of sec-

tion 37(b) and section 37(d)(2), "earned income means the entire amount of such income and shall not be reduced by any expenses connected with the earning of such income."

We think that respondent's determination frustrates the purpose of section 37 and is not compelled by the controlling statutory language. Prior to the enactment of section 37, the Commissioner, in 1941, issued a ruling that retirement benefits under the social security program were nontaxable. I.T. 3447, 1941-1 C.B. 191. Yet pensions under most other publicly administered retirement programs, industrial retirement pensions, and retirement income derived from individual arrangements remained taxable. Section 37 was added to the tax law by the 1954 Code for the express purpose of ending this discrimination by granting persons receiving taxable retirement income a tax credit roughly equivalent in value to the tax exemption of social security benefits. Pertinent to our problem in this case, an individual was permitted by section 37 "to earn up to $900 a year as an employee or in self-employment without affecting the amount of the retirement credit"; this earnings limitation was intended to be substantially "the same test of retirement as that adopted for social-security purposes." H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 8 (1954); S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 8 (1954).[4] Under both statutes the test of retirement is keyed to the amount of an individual's earnings apart from retirement benefits.

In applying the retirement test, the Social Security Act differentiates between wages and earnings from self-employment. Gross earnings from wages[5] in excess of the statutory amount preclude retired status for social security benefit purposes, but only *net* excess earnings from self-employment will affect the benefits of an otherwise eligible social security retiree.[6] Respondent's interpretation of section 37, on the other hand, applies a gross earnings test to both wages and self-employment income. In our opinion, respondent's treatment of earned

---

[4] Other provisions of sec. 37 also parallel the Social Security Act. For example, the eligibility requirement under sec. 37(b) of 10 years in which "earned income" is received corresponds with the Social Security Act test of covered employment in 40 quarters; and the maximum amount of retirement income prescribed by sec. 37 corresponds with the maximum social security benefit. Sec. 37 has been amended several times and the committee reports accompanying the amendments have carefully explained that the purpose was to conform the section with amendments to the Social Security Act. S. Rept. No. 2202, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 1238-1239; S. Rept. No. 830, 88th Cong., 2d Sess. (1964), 1964-1 (Part 2) C.B. 542-543.

[5] Wages include *all* remuneration for employment. 42 U.S.C. sec. 409 (1964).

[6] Payments of social security benefits are decreased by "excess earnings." 42 U.S.C. sec. 403(b) (1964). An individual's earnings are the sum of his wages and *net earnings* from self-employment. 42 U.S.C. sec. 403(f)(5)(A) (1964). Net earnings from self-employment are determined as provided in sec. 411. 42 U.S.C. sec. 403(f)(5)(B)(i) (Supp. 1969). This term means the gross income, as computed under ch. 1 of tit. 26, derived by an individual from any trade or business carried on by him, less the deductions allowed under that chapter which are attributable to his trade or business. 42 U.S.C. sec. 411(a) (Supp. 1969).

income from self-employment violates the declared congressional intent to apply substantially "the same test of retirement" under both statutes and discriminates against individuals receiving taxable retirement income from self-employment which may require large amounts of expenditures in comparison with the net earnings derived therefrom. Thus, applying respondent's interpretation, petitioner would receive no retirement credit for 1965 (except for $19.05) against his taxable Air Force retirement income even though he sustained a net loss from his real estate business. By way of contrast, a social security beneficiary engaged in a similar business would not be disqualified from receiving his tax-exempt benefits unless his net (not merely gross) earnings from self-employment exceeded the amount statutorily prescribed for his age group.[7]

We must, therefore, examine section 911(b), incorporated into section 37 by subsection (g) thereof, to determine whether its language is so clear and explicit as to require the gross earnings from self-employment rule advocated by respondent. In so doing, it must be remembered that the incorporation of one statute into another by cross-reference is done to "avoid duplication and prolixity, and calls for practical and sensible interpretation in fitting the provisions of the adopted statute into the scheme of the adopting one." *Werntz* v. *Jennings*, 34 Del. Ch. 226, 230, 101 A. 2d 806, 809 (1954) ; see also *Swanson* v. *State*, 132 Neb. 82, 88, 271 N.W. 264, 268 (1937). Furthermore, we must not lose sight of the evil section 37 was designed to remedy, see *Griffiths* v. *Commissioner*, 308 U.S. 355, 358 (1939); *Sheaffer's Estate* v. *Commissioner*, 313 F. 2d 738, 743 (C.A. 8, 1963), affirming 37 T.C. 99 (1961), certiorari denied 375 U.S. 818—the discrimination against recipients of taxable retirement income and in favor of those receiving Social Security Act benefits. Except in rare instances, statutes are written in general terms and do not undertake to specify all the situations they are meant to cover. Their "interpretation" demands, on occasions, the projection of their expressed purpose to situations not precisely in the minds of those who enacted them. See, e.g., *Tate* v. *United States*, 359 F. 2d 245, 254 (C.A. D.C. 1966) ; accord, *Eastern Airlines, Inc.* v. *C.A.B.*, 354 F. 2d 507, 511 (C.A. D.C. 1965). See generally, Cardozo, Nature of the Judicial Process 15 (1963 ed.).[8]

---

[7] The harshness of respondent's determination herein is brought into clear focus by examination of the pertinent amounts for the years 1964 and 1965. Thus, in 1964, petitioner received gross commissions of $10,713.75, but had net profit of only $1,138.75 ; in 1965, he received gross commissions of $5,274 and had a net loss of $136.50.

[8] Where the Social Security Act and corresponding tax provisions are mutually related, or aimed at accomplishing the same results, they are read together. See *Brown & Bartlett* v. *United States*, 330 F. 2d 692, 694 (C.A. 6, 1964) ; cf. *United States* v. *Silk*, 331 U.S. 704, 711 (1947). The same principle should be applicable where the congressional purpose is to adjust the tax treatment of other retirement income to that accorded social security benefits.

While section 911(b) defines the term "earned income" to mean "wages, salaries, or professional fees, and other amounts received as compensation for services actually rendered," it does not refer to expenses incurred in self-employment. In the case of a taxpayer "engaged in a trade or business in which both personal services and capital are material income-producing factors," however, earned income is keyed to the "net profits of such trade or business," not to the gross profits thereof. There is nothing in the language of the section to suggest that, in the case of a "trade or business" in which capital is not a material income-producing factor but in which expenses are substantial, the focus should be on gross, rather than net, profits. Given the absence of any specific language regarding this latter type of trade or business and the presence of a clearly defined legislative purpose to coordinate section 37 with the Social Security Act, we think it clear that "other amounts received as compensation for services actually rendered," incorporated into section 37 from section 911(b), refers to the net rather than the gross amounts received as compensation for services rendered in self-employment. This interpretation applies the "same test of retirement" under section 37 and the Social Security Act, consonant with the precisely stated congressional intent.[9]

Regulations section 1.37-2(a), relied upon by respondent, appears to have had its genesis in a revision of certain early pronouncements by the Internal Revenue Service. In Mim. 3471, V-2 C.B. 16-17 (1926), entitled "Introductions and illustrations for computing the credit for earned income under the Revenue Act of 1926,"[10] it is stated that "If the business requires only a nominal capital and the income is derived principally from the personal services of the taxpayer, as a doctor or lawyer, the entire *profits*, not exceeding $20,000, may be considered as earned income." (Emphasis added.) The mimeograph contained the further statement that "If a taxpayer is engaged in the practice of a profession on his own account and employs an assistant over whom he exercises only a perfunctory supervision, the *profit* resulting from the labor of such assistant cannot be regarded as earned income by the employer unless his total net income is less than $5,000." (Emphasis added.) In Mim. 3802, IX-1 C.B. 121-122 (1930), reconsideration was given to the situation where a taxpayer, engaged in a

---

[9] This interpretative problem does not arise in applying the income-exclusion provisions of sec. 911, because par. (a)(2) thereof expressly disallows "any deductions (other than those allowed by section 151, relating to personal exemptions) properly allocable to or chargeable against amounts excluded from gross income under this subsection." Compare sec. 401(c)(2)(A), relating to pensions for self-employed persons, which defines "earned income" to mean "the net earnings from self-employment (as defined in section 1402(a)), but such net earnings shall be determined—(1) only with respect to a trade or business in which personal services of the taxpayer are a material income-producing factor * * *."

[10] The language of sec. 911(b) was derived from the earned-income credit provisions of sec. 25 of the Internal Revenue Code of 1939 and its predecessors. See 5 Mertens, Law of Federal Income Taxation, sec. 32.07.

professional occupation, employs assistants who perform part or all of the services, and it was ruled that in such cases "the entire amount received as professional fees" is earned income of the taxpayer "provided the clients or patients are those of the taxpayer and look to the taxpayer as the responsible person in connection with the services performed." While Mim. 3802 refers to the "entire amount received as professional fees," it is clear that the modification of Mim. 3471 was directed toward the treatment of profits derived from the work of assistants, not toward a change of the rule that the *profit* from such fees rather than the gross receipts therefrom represented earned income. Regulations section 1.37–2(a), apparently following the language of Mim. 3802, refers to the "entire amount" of earned income not, however, in terms of the individual to whom the earnings are to be attributed, but rather in terms of the gross amount of earnings received.

For the reasons stated above, while we think section 1.37–2(a), Income Tax Regs., is consistent with section 37 when applied to wages and salaries—the Social Security Act refers to gross income from wages and salaries—we conclude that it is not intended to, and does not, apply to income derived from self-employment.

Accordingly, we hold that petitioners' earned income for purposes of the section 37(d)(2) limitation was $3,836.60 in 1962; $3,380 in 1963; $1,138.75 in 1964; and zero in 1965.

While the issue is not before us, we are aware that this interpretation of "earned income" creates a somewhat more stringent eligibility requirement for the retirement income credit than a test based on gross earnings from self-employment, since section 37(b) limits the benefits of the section to individuals who have received earned income in excess of $600 per annum in any 10 years prior to the taxable year. However, this eligibility requirement is analogous to one of the work-qualifying tests—"40 quarters of coverage"[11]—for a "fully insured" status under the Social Security Act, which also employs a net earnings from self-employment standard. See fn. 6, *supra.* And Congress was careful to explain that in section 37 it was adopting "a work-qualifying test similar to one used for social-security purposes to determine whether an income recipient * * * is a person who has actually engaged in gainful employment." H. Rept. 1337, *supra* at 8; S. Rept. No. 1622, *supra* at 8.

Petitioner's third contention is that in applying the section 37(d)(2) limitation on retirement income all of the earned income from his real estate brokerage business should be treated as his, and, therefore, his wife's community share of the retirement income from the Air

---

[11] 42 U.S.C. sec. 414(a)(2) (1964). A quarter of coverage is a 3-month period in which an individual receives $50 in wages or $100 of self-employment income. 42 U.S.C. sec. 413 (a)(2) (Supp. 1969).

Force pension should not be reduced by any of his earnings. Petitioner does not deny that his earnings are community income. Tex. Rev. Civ. Stat. Ann., art. 4619 (1960) ; *Hopkins* v. *Bacon*, 282 U.S. 122 (1930). Nor does he question that his Air Force pension income was community income. Cf. *Charles R. Wilkerson*, 44 T.C. 718 (1965), affd. 368 F. 2d 552 (C.A. 9, 1966). But, here again, he argues that as to his post-retirement earnings section 37 must be coordinated with social security legislation. The Social Security Act in defining "net earnings from self-employment" (upon which the post-retirement earnings limitation is based, see fn. 6, *supra*) provides that community income, except in unusual circumstances, is to be treated as income of the husband. 42 U.S.C. sec. 411(a)(5)(A) (1964) ; cf. sec. 1402(a) (5)(A).

Thus, petitioner's position is that his retirement income for which the credit is granted should be divided, by reason of the community property laws, equally between him and his spouse, but that all his earned income—which may reduce the amount of the credit—should be attributed solely to him. There is no basis in section 37 for such an inconsistency. The regulations clearly provide that when a joint return is filed, the retirement income credit for each spouse eligible for the credit must be separately computed. Sec. 1.37–1(d), Income Tax Regs.; accord, *Charles R. Wilkerson*, *supra*. "If retirement income constitutes community income under community property laws applicable to such income, the retirement income credit of each spouse shall be separately computed by taking into account one-half of such amounts." Sec. 1.37–1(e), Income Tax Regs.; accord, *W. F. Williams*, 51 T.C. 346 (1968). As stated, petitioner does not dispute that the amounts received from his Air Force pension were community income. Further, for the purpose of the section 37(d)(2) limitation, "income earned by either spouse which constitutes community income under community property laws applicable to such income shall be treated as earned income received one-half by each spouse." Sec. 1.37–2 (a), Income Tax Regs.; accord, *Richard B. Gantt*, 46 T.C. 290 (1966). Accordingly, in computing the retirement income credit, both the Air Force pension and the net profit from the real estate business must be divided between the spouses as community income.

Congress has recognized that section 37 is not fully coordinated with the Social Security Act with respect to residents of community property States. In 1957, the House proposed to change the rule that "In community property States earned income of the husband [in application of the sec. 37(d)(2) limitation] is divided equally between the two spouses," by following the Social Security Act in attributing such income to the individual spouse who is actually employed and who renders the services. H. Rept. No. 775, 85th Cong., 1st Sess. (1957),

1958-3 C.B. 815. The Senate, on the other hand, would have extended the community property rules to the common-law States. S. Rept. No. 1983, 85th Cong., 2d Sess. (1958), 1958-3 C.B. 931-933. Congress was unable to choose between these opposite approaches and the provision was eliminated from the legislation, as enacted (the Technical Amendments Act of 1958, Pub. L. 85-866, approved September 1958, 72 Stat. 1606), so that no change was made in the existing law. Conf. Rept. No. 2632, 85th Cong., 2d Sess. (1958), 1958-3 C.B. 1204.

We think it quite clear, therefore, that respondent is correct in his position that the retirement income and the earned income, both being community income, must be divided equally between petitioner and his wife in computing the section 37(d)(2) limitation on their retirement income.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*