*Decision will be entered under Rule 50.*

## WILLIAM A. CORRAO ELECTRIC COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 21358. Promulgated April 29, 1931.

1372

*William R. Gilbert*, *Esq.*, for the petitioner.

*J. Arthur Adams*, *Esq.*, and *Frank A. Surine*, *Esq.*, for the respondent.

OPINION.

MARQUETTE: A personal service corporation is defined by section 200 of the Revenue Act of 1918 as one:

\* \* \* whose income is to be ascribed primarily to the activities of the principal owners or stockholders who are themselves regularly engaged in the active conduct of the affairs of the corporation and in which capital (whether invested or borrowed) is not a material income-producing factor; but does not include \* \* \* any corporation 50 per centum or more of whose gross income consists \* \* \* of gains, profits or income derived from trading as a principal \* \* \*.

In order to become entitled to classification as a personal service corporation, therefore, it is requisite that the petitioner meet each and all of the requirements set out in the statute above quoted. *Robischon & Peckham Co.*, 11 B. T. A. 483.

The evidence shows that in the year 1920 the petitioner's gross income amounted to $461,317.01, of which $428,233.13 was derived from the business of independent contracting for electrical construction work. It also shows that in 1921 the petitioner's gross income amounted to $332,268.95, of which $301,336.96 was likewise derived from the independent contracting business. Some of the construction contracts were obtained by successful competitive bidding in the open market, while others were taken on the cost-plus basis. But regardless of the character of the contracts as to the basis on which payment was to be made, in fulfilling them it was necessary for the petitioner to use considerable amounts of capital. Thus, in 1920, the cost of material furnished by the petitioner in its construction contracts amounted to $186,972.35 and its labor costs were $172,081.67. In 1921 the cost of materials furnished amounted to $107,577.57 and labor costs were $98,616.41. That the use of capital in connection with the fulfillment of those contracts was a material income-producing factor is, in our opinion, beyond doubt, and the petitioner is not entitled to personal service classification. See *Thompson & Binger, Inc.*, 1 B. T. A. 1093.

One other question is involved in this proceeding, namely, whether the petitioner is entitled to have its excess profits taxes computed under section 303 of the Revenue Act of 1918. That section reads as follows:

SEC. 303. That if part of the net income of a corporation is derived (1) from a trade or business (or a branch of a trade or business) in which the employment of capital is necessary, and (2) a part (constituting not less than 30 per centum of its total net income) is derived from a separate trade or

business (or a distinctly separate branch of the trade or business) which if constituting the sole trade or business would bring it within the class of "personal service corporations," then (under regulations prescribed by the Commissioner with the approval of the Secretary) the tax upon the first part of such net income shall be separately computed (allowing in such computation only the same proportionate part of the credits authorized in sections 311 and 312), and the tax upon the second part shall be the same percentage thereof as the tax so computed upon the first part is of such first part: *Provided,* That the tax upon such second part shall in no case be less than 20 per centum thereof, unless the tax upon the entire net income, if computed without benefit of this section, would constitute less than 20 per centum of such entire net income, in which event the tax shall be determined upon the entire net income, without reference to this section, as other taxes are determined under this title. The total tax computed under this section shall be subject to the limitations provided in section 302.

From the evidence it appears that during each of the years here involved the petitioner carried on two classes of work: (1) that of an independent contractor; and (2) that of supervising electrical construction and installation, not requiring the use of capital by the petitioner, and for which the petitioner received for its service either a fixed monthly fee, or a commission. It also appears that in 1920 the petitioner received for its purely supervisory work, $32,644.95 and that its total taxable net income for the year amounted to $36,457.49. In 1921 it received for supervisory work $30,055.67, while its total taxable net income amounted to $37,641.76. The supervisory work, then, contributed about 89 per cent of the net income for 1920, and about 79 per cent for the year 1921. If such supervisory work constituted a separate branch of petitioner's trade, which if constituting the sole trade or business would bring the petitioner within the class of personal service corporations, then under the statute the petitioner's excess profits taxes are to be computed in accordance with the provisions of section 303.

In order to qualify for such computation of excess profits taxes the petitioner must show that, considering its purely supervisory work to be its only business, (1) the income from such work is ascribable primarily to the activities of the principal owners or stockholders; (2) that such principal stockholders were themselves regularly engaged in the active conduct of petitioner's affairs, and (3) that capital was not a material income-producing factor.

With respect to the one question of petitioner's right to tax computation under section 303, the second requirement set forth above must be taken to mean that the principal stockholders were regularly engaged in the active work of carrying out the contracts for supervision only.

The evidence shows that Mrs. Allison owned 27.27 per cent of petitioner's stock and that she contributed no services of any character to the company's affairs, either in 1920 or 1921, and shows

that E. P. Allison owned 32.73 per cent of the stock. He testified with respect to the contracts for supervisory work as follows:

Q. Now, Mr. Allison, you testified you rendered approximately fifteen per cent. of your time to services in connection with these contracts in 1920, didn't you?

A. Yes, sir.

Q. You do not think any part of your time should have been charged to these eight contracts?

A. No, sir; I do not.

Q. What should it have been charged to?

A. None of it.

Q. All charged to the straight contracting business, is that correct?

A. Yes, sir.

Q. What was the basis for that statement?

A. Because my time was not specific time spent, but it was simply for the purpose of advising or in negotiating or closing the contract. In other words, my time was not applied on those personal service contracts as Mr. Crowley's time was applied. His was in active construction on engineering and supervising construction work. My time was spent as I came in contact with them in investigating or in checking the business as a whole.

Q. And you still believe that you spent approximately 15 per cent. of your time in 1920 in connection with the work on these eight contracts?

A. I would not take oath on that, but I would say to the best of my knowledge and belief. If I were to get down to an oath I would say five to seven per cent. and not over 15 per cent.

Q. But not over 15?

A. Not over 15 per cent.

Q. From five to seven to fifteen per cent. of your time was devoted to these eight contracts in the year 1920, is that correct?

A. Yes, sir. I have a hard time to establish that fact, because my time was spent in a general way, not a specific part of my time.

Q. But you are willing to testify it was not in excess of 15 per cent. is that correct?

A. Yes, sir.

Q. You feel that none of your salary should be charged to the expenses of these eight contracts now in question?

A. Yes, sir, that is correct, because that is a fact. You might qualify that in this way, because of the fact that it was not the intent of the contracts that my time should be charged against them. It was not the intent of the contracts that I was to devote my personal time to those contracts.

Q. Whose time was to be devoted to them?

A. Mr. Crowley's.

Q. And therefore you intended Mr. Crowley to devote his time to the performance thereof and not your time?

A. That is correct.

'Q. And for that reason you think none of your time should be charged to these eight contracts?

A. Yes, sir.

It also appears from the evidence that Crowley, who owned the remaining 40 per cent of the stock, devoted 95 per cent of his time in 1920 and 15 per cent of his time in 1921 to the work under the supervisory contracts.

It is apparent, we think, that such time and attention as was devoted to the supervisory work by E. P. Allison during both years, did not serve to stamp him as one who was regularly engaged in that work. He was occasionally called upon for advice concerning the work, and he negotiated three supervisory contracts in 1920. His services in connection with that branch of the work were rendered from time to time as required, and not as a regular part of his work. His testimony clearly shows that he and Crowley planned and intended that the supervisory work should be cared for by Crowley, while Allison devoted himself to other work. The facts here are similar to those in *Albrecht & Weaver, Inc.*, 9 B. T. A. 560, wherein it was held that such intermittent and irregular services were not equivalent to being regularly engaged in the active conduct of the company's affairs. See also *Matteson* v. *Willcuts*, 12 Fed. (2d) 447.

Both Allison and his wife were principal stockholders. *Robischon* v. *Peckham Co.*, *supra*. Together they owned 60 per cent of petitioner's capital stock. As neither of them was regularly engaged in the supervisory work carried on by the petitioner, the requirements of section 303 of the Revenue Act of 1918 have not been met.

*Judgment will be entered for the respondent.*