SAM L. AND NANCY J. SMITH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ERNEST R. AND CHARLENE SMITH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Smith v. Commissioner
Docket Nos. 2901-81, 2902-81.
United States Tax Court
T.C. Memo 1983-93; 1983 Tax Ct. Memo LEXIS 694; 45 T.C.M. (CCH) 756; T.C.M. (RIA) 83093; February 10, 1983. Gregory J. Meurer, for the petitioners. Mark S. Feuer, for the respondent. KORNER
MEMORANDUM OPINION KORNER, Judge: Respondent determined deficiencies in petitioners' income tax as follows: CALENDAR YEAR
SAM L. AND NANCY J.
ERNEST R. AND
ENDING
SMITH
CHARLENE SMITH
1976
$16,769.55
$18,238.94
1977
18,910.28
19,119.41
These cases were consolidated for purposes of trial, briefing and opinion. After concessions, the only issue to be decided is whether the income derived by petitioners from the operations of the Smith Brothers Painting Co. qualified for the 50% maximum rate of tax on personal service income as provided by section 1348 of the Code in the years here in issue. [1]
*696 These cases were submitted to the Court without trial on a full stipulation of facts pursuant to the provisions of Rule 122. Such stipulation of facts and accompanying exhibits are incorporated herein by this reference, and form the basis of our findings of fact. Petitioners Sam L. Smith and Nancy J. Smith, husband and wife, filed timely joint returns of income for the years 1976 and 1977. Petitioners Ernest R. Smith and Charlene Smith, husband and wife, likewise filed timely joint individual income tax returns for the years 1976 and 1977. At the time of filing their petitions herein, all petitioners were residents of Middletown, Ohio. Petitioner Sam L. Smith and petitioner Ernest R. Smith (hereinafter referred to as the "partners" or "petitioners" [2]) are brothers, and, during the years 1976 and 1977 were partners in a firm doing business as Smith Brothers Painting Co. (hereinafter referred to as the "partnership"). The partnership began doing business on or about April 1, 1968, succeeding to the on-going painting business of Langley Smith, the father of petitioners. *697 At the time of the commencement of the partnership, its capital included $10,000 in cash which had been given by Langley Smith to his sons, and a small amount of painting tools, including spray guns, hoses and ladders. The partnership was engaged primarily as a painting contractor to Armco, Inc. (hereinafter referred to as "Armco") at its steel works in Middletown, Ohio. The partners and the employees of the partnership performed scraping or sandblasting to prepare primarily metal surfaces for painting, and then painted those surfaces. In 1971, the partnership added waterblasting operations to the work performed by its employees for Armco, which involved primarily cleaning out pipes of various types and degreasing Armco equipment. Waterblasting is a cleaning operation only, and in contrast to sandblasting is not preparatory to painting. Also at this time, the partnership began vacuuming operations for Armco, another cleaning operation. Armco is a major national and international steel producer.The Armco facilities in southwest Ohio are very extensive, with operations centered in New Miami and Middletown, Ohio.Plant facilities include coke ovens, blast furnaces, rolling mills *698 and fabrication facilities, and all other facilities necessary for the production of steel products. All of the Armco facilities needed periodic cleaning and some required painting. This was the work contracted to the partnership. Armco has traditionally employed independent contractors to perform certain aspects of its business operations. These independent contractors, including the partnership herein, are to a great extent "captives" of Armco, depending upon Armco for all or substantially all of their business income. During the years 1976 and 1977 the partnership was almost exclusively a captive subcontractor of Armco. The employees of the partnership included unskilled, semi-skilled and skilled workmen. Typically, a new employee of the partnership would start as a laborer without any skills or experience. As the employee became experienced, he would be assigned as a helper on a sandblasting crew, waterblasting crew, vacuum truck operation, or a painting crew. As the employee gained in experience, he could move into being a crew leader. Through their experience, the employees of the partnership had to learn the proper and safe use of the various pieces of equipment employed *699 by the partnership in its operations. A sandblasting operator, for example, had to learn not only how to handle safely the sandblasting equipment, but also to use it in such a way as not to damage the structure being cleaned.The employees had to learn regular maintenance on the equipment and had to be able to make adjustments. A vacuum truck, for example, was a large piece of equipment which required constant maintenance and cleaning and had to be operated with an experienced crew, to avoid clogging or breaking down.
Because of the type of work performed by the partnership, its equipment was exposed to a very dirty and often corrosive atmosphere. The partnership's equipment required a large amount of maintenance. The cost of parts and maintenance on the partnership's equipment was often passed on to Armco by the partnership in its billings. Some of the work, such as working on high smoke stacks, was hazardous, and some of the partnership's equipment was dangerous and required skill in operations. Waterblasting involves the use of equipment which shoots a very thin stream of water under extremely high pressure. It is a practiced skill to operate waterblasting equipment, to *700 hold, aim and direct the stream of water safely. Much of the work performed by the partnership was seasonal in nature, and for this reason, as well as the demands of Armco for work, the employees of the partnership in the years 1976 and 1977 fluctuated between a low of 20 and a high of 110. The supervision of the employees of the partnership was handled by the partners, a general manager, and three supervisors who had been with the partnership and its predecessor operation for a number of years. The partners estimated that approximately 55% of the employees of the partnership were employed in the general cleaning and painting operations of the firm in 1976 and 1977; approximately 30% of the employees were engaged in waterblasting; approximately 5% of the employees were employed in vacuuming; approximately 8% of the employees were engaged in sandblasting; and approximately 2% of the employees were engaged in miscellaneous labor functions. The general cleaning and painting operations of the partnership typically included scraping and painting large above-ground gas lines, water towers, smoke stacks and buildings. Typical of the equipment used in such operations were handscrapers *701 and brushes, ladders, paint brushes, rollers and sprayers. Sandblasters were also used at times to prepare surfaces for painting. The painting of a typically large building, for example, a pickling plant, would use approximately 4,000 gallons of paint. The operation of sandblasting equipment required approximately 600 pounds of sand for one hour of work. Although actual figures for 1976 and 1977 were not available, the partners estimated that during the taxable years, the cost of paint was approximately $10 a gallon and the cost for sand was approximately $50 a ton.The paint and sand necessary for the performance of these tasks were purchased and supplied to the partnership by Armco. The specialized or heavy cleaning operations of the partnership required the use of mobile equipment such as waterblasters, air compressors, sandblasters, and vacuum units. Waterblasters would typically be used to clean duct work in the various Armco buildings, sandblasters would be used to clean fans or other structures, and vacuum trucks would be used to clean large pollution control and other equipment, as well as for the general cleaning of Armco buildings. In many instances, glass beads would *702 be used instead of sand in the sandblasting equipment. The glass beads could clean the dirt off the metal without etching the metal surface. Approximately 1,200 pounds of glass beads would be used in one hour of operation. The partners estimated that the cost of glass beads during the taxable years 1976 and 1977 was approximately 23 cents a pound. The glass beads necessary for the performance of these tasks were purchased by and supplied to the partnership by Armco. The tools and equipment owned by the partnership were used for various purposes. Trucks were used to haul sand or other materials to the job sites, to haul debris away from the job sites, and to transport equipment such as waterblasters, sandblasters, air compressors, pumps and work crews. Air compressors were used to power the sandblaster units and for spray painting. Pumps were used to pump water, mud and sludge. Painting equipment was used to paint. Skyclimbers were used to reach high areas as an alternative to ladders and scaffolding. The vacuum unit owned by the partnership was actually used only approximately 90 days during 1976, and less than 10 days the following year. In 1977, Armco purchased a larger *703 and technically superior vacuum truck for use by the partnership, at an estimated cost of $80,000. There was apparently no charge to the partnership for the use of this vacuum truck. At the close of the taxable year 1976, the partnership had depreciable assets of various sorts (including the equipment used in its work) with an adjusted book value of $180,878.00, on which it had claimed depreciation in the amount of $48,078 for the year. The corresponding figures for 1977 were $201,637 and $61,497. Until late in the taxable year 1977, the partnership owned no real estate or buildings. For use as an office, the partnership leased a small mobile home type trailer of approximately 300 square feet in an area which was placed on Armco property in the middle of the Middletown works. The partnership purchased the trailer for $500 in late 1977. Most of the vehicles and larger equipment owned by the partnership were parked outside on Armco property. Armco made available to the partnership some warehouse and garage space for storing tools, specialized equipment and some vehicles. In the last month of 1977, the partnership placed in service a frame building which it used for an office, *704 outside Armco's facilities, which it had acquired at a cost of $12,614. During the years 1976 and 1977 the partners were generally working at the Armco location. The partners negotiated with Armco, did estimates of cost, supervised the general manager, and performed trouble-shooting tasks and training at the individual work sites. The partners' long experience at Armco's facilities and with its operation was vital to the efficient operation of the business. The gross price for labor and rental of equipment by the partnership to Armco was set by various purchase orders issued annually by Armco. Although the purchase orders set the price which the partnership charged to Armco for labor and equipment, the actual work of the partnership was assigned by Armco on a case by case basis. The partnership billed Armco on a weekly basis for the actual hours which men and equipment were employed by the partnership and the partnership was paid on this basis. During 1976 and 1977, the standard labor rate (base rate) charged to Armco by the partnership was $8.00 and $10.00 an hour respectively. A $2.00 per hour premium rate for high or structural work was charged beginning in 1977 and *705 50% premium for overtime was charged. The time of supervision and maintenance employees of the partnership was charged to Armco at the same rates. During the taxable years 1976 and 1977 the partnership also charged Armco an hourly rate for the use of certain types of equipment. Waterblasters were billed by the partnership to Armco at the rate of $18.00 per rental hour. Air compressors were billed by the partnership to Armco at the rate of $8.00 per rental hour. A dump truck was billed by the partnership to Armco at the rate of $8.00 per rental hour. A pump was billed by the partnership to Armco at the rate of $6.50 per rental hour. The use of sandblasting equipment, small pumps, other trucks, the passenger vehicles, and maintenance equipment owned by the partnership was not charged to Armco. Occasionally a piece of equipment owned by the partnership might be rented to Armco without a crew supplied by the partnership. The equipment owned by the partnership, however, was generally used in conjunction with the employees of the partnership to perform a specific task assigned by Armco. Waterblasting would generally require a crew of two or three employees and the partnership *706 would charge Armco $16.00 to $30.00 an hour (at the base rate) for labor and $18.00 an hour for the equipment. Sandblasting would require a crew of two, and the partnership would charge Armco at $16.00 to $20.00 per hour (at the base rate) for labor and $8.00 for the equipment. The partnership would charge Armco for use of a dump truck at $8.00 to $10.00 per hour (at the base rate) for labor and $8.00 for the equipment. Although the rates billed to Armco for high work or overtime labor by the employees of the partnership were higher than the base rate billed to Armco, the rates billed for equipment did not vary. Waterblasters, sandblasters, air compressors, pumps and vacuum trucks are all labor-saving devices. Without this equipment the partnership would have had to employ substantially more employees so that the work performed using this equipment could be done by hand. In the case of vacuum trucks, one typical use of this equipment was to remove accumulated dirt and iron oxide from the roofs of the blast furnace buildings at Armco. The partnership was able to perform this task using the vacuum truck and a crew of three men. Without the vacuum unit, a crew of 30 laborers *707 would have been necessary to do the same work. During the taxable years 1976 and 1977, no substantial inventory of small parts and equipment was maintained by the partnership. The partnership did maintain a small inventory of replacement parts, work clothes, small equipment, gloves and fuel. During these years, the partnership purchased ropes and hoses as needed, and charged Armco for these materials at cost to the partnership plus 2%. Sand, water, glass beads, painting supplies, paint, electricity, diesel fuel, cleaning supplies, compressed air and other supplies were supplied to the partnership by Armco. The materials supplied by Armco were necessary for the partnership to conduct its business. The cost to Armco for the paint supplied by it to the partnership for painting operations performed by the partnership where the cleaning of the surface was done by hand was approximately 25% of the cost to Armco of the labor. The cost to Armco of the sand supplied by it to the partnership for the sandblasting operation was approximately equal to the cost per man employed by the partnership in sandblasting operations. The cost to Armco for glass beads supplied to the partnership *708 for use by it in its blasting operations was approximately twice the cost to Armco of the labor for that operation supplied by the partnership. The cost to Armco for water supplied by it to the partnership for use by the partnership in its waterblasting operations was a minor cost in comparison to the cost of labor to Armco supplied by the partnership. Excluding the cost to it of the vacuum truck used by the partnership, the cost for parts for the vacuum truck to Armco was approximately 5% of the cost to Armco of the labor supplied by the partnership. All the net capital shown on the partnership's books at the end of the years in issue ($257,227.65 in 1976 and $383,155.94 in 1977) was derived either from capital contributions of the partners or from retained partnership earnings. The capital shown on the partnership books does not reflect the additional working capital indirectly supplied to the partnership by Armco through the provision, at no cost, of equipment and materials used by the partnership in performing work for Armco, as set forth above herein. The adjusted book value of depreciable equipment used by the partnership was $180,878.00 at the end of 1976 and $201,637.00 *709 at the end of 1977. [3]
During the taxable year 1976, the partnership reported gross receipts in the amount of $1,823,041, of which $1,255,560, or 68.87%, represented billings to Armco for labor, and $567,481, or 31.13%, represented billings to Armco for equipment and material. The same percentage division between labor billings and equipment and material billings applied to the gross receipts reported by the partnership for 1977 in the amount of $1,541,457. [4] Substantially all of the gross receipts of the partnership were attributable to jobs in which both materials and labor were necessary for the performance of the work of the partnership. After subtracting $35,527 in 1976 and $128,133 in 1977 as "cost of goods sold and/or operations," the partnership reported "gross profit" or gross income of $1,787,514 and $1,413,324 respectively. *710 In the statutory notices of deficiency issued to petitioners for the years 1976 and 1977, respondent determined that only 30% of petitioners' distributive shares of income from the partnership qualified as "earned income" for purposes of computing the maximum tax under section 1348.
Capital was a material income-producing factor in the conduct of the partnership's business in 1976 and 1977. The sole issue which we must decide is whether the entire amount of petitioners' shares of partnership income from Smith Brothers Painting Co. qualifies for the benefits of section 1348 for the years 1976 and 1977, as petitioners contend, or whether only 30% of such partnership income so qualifies, as respondent contends. For these years, section 1348 provided that the maximum tax rate on earned taxable income would be limited to 50%. [5]
*711 Earned income, within the meaning of section 1348, is defined by reference to the provisions of section 401(c)(2)(C) and section 911(b). The former section, having to do with income earned from the sale, transfer or license of products by an individual whose personal efforts created such property, has no application in the present case. Section 911(b), however, is applicable and provides the pertinent standard for "earned income" which must be met herein. As in effect in the years here in issue, section 911(b) reads as follows: (b) Definition of Earned Income. -- For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered.In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producting factors, under regulations *712 prescribed by the Secretary, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income. [6]
The test to be applied in this case in determining whether capital is a material income-producing factor in the business of the partnership is furnished by respondent's regulations. Section 1.1348-3(a)(3)(ii), Income Tax Regs. (adopted in 1976), states: (ii) Whether capital is a material income-producing factor must be determined by reference to all the facts of each case. Capital is a material income-producing factor if a substantial portion of the gross income of the business is attributable to the employment of capital in the business, as reflected, for example, by substantial investment in inventories, *713 plant, machinery, or other equipment. In general, capital is not a material income-producing factor where gross income of the business consists principally of fees, commissions, or other compensation for personal services performed by an individual.Thus, the practice of his profession by a doctor, dentist, lawyer, architect, or accountant will not, as such, be treated as a trade or business in which capital is a material income-producing factor even though the practitioner may have a substantial capital investment in professional equipment or in the physical plant constituting the office from which he conducts his practice since his capital investment is regarded as only incidental to his professional practice. The materiality of the relative importance of personal services and capital as income-producing factors in a particular trade or business, as expressed in section 911(b) and as adopted by section 1348, is not a novel idea, but is derived from a long history of other tax law provisions which have included the same concept. As we pointed out in Miller v. Commissioner,51 T.C. 755, 759 (1969): The concept in that section [section 911(b)] of a "trade or *714 business in which both personal services and capital are material income-producing factors" is not unique. Analogous language appeared in section 200 of the Revenue Acts of 1918 and 1921, relating to personal service corporations; 1939 Code section 25(a)(4), containing definitions for the computation of an earned-income credit; section 704(e)(1), relating to family partnerships; and section 1361(b)(4) (now repealed), dealing with unincorporated enterprises electing to be taxed as domestic corporations * * *. Accordingly, although it is appropriate to look for guidance in other cases dealing with such other tax law provisions employing the "earned income" concept, Bruno v. Commissioner,71 T.C. 191 (1978), it is nevertheless clear that whether capital is a "material income-producing factor" is a factual question which must be determined from all facts and circumstances of the particular case. Bruno v. Commissioner,supra;Rousku v. Commissioner,56 T.C. 548, 550 (1971). Petitioners, of course, have the burden of proving their entitlement to the benefits of section 1348 with respect to their entire distributive shares of the *715 partnership's income. Rule 142(a). In interpreting the meaning of "earned income," as used in section 911(b), the Court of Appeals for the Ninth Circuit succinctly stated in Robida v. Commissioner,460 F.2d 1172, 1175 (9th Cir. 1972), affg. a Memorandum Decision of this Court: Congress meant income derived from labor, broadly defined, to be earned income and income derived from the use of property not to be earned income for the purpose of section 911. * * * The key element is the presence or absence of capital as the income-producing factor * * *. This Court further said in Rousku v. Commissioner,supra, at 551-552: We recognize that no definite percentage ratio of gross income derived from capital sources to total income can be fixed at an exact point as a key to deciding when capital is a material income-producing factor. Whether the use of capital is a material income-producing factor is not necessarily to be determined by the amount or the cost of capital assets which are used in the business; rather it is the contribution of such capital in earning income which is the true test. United States v. Van Dyke,     F.2d    , 83-1 USTC par. 9127 (Fed. Cir. 1982); *716 Moore v. Commissioner,71 T.C. 533 (1979); Fuller & Smith v. Routzahn,23 F.2d 959 (N.D. Ohio 1927). Nor is the source of the capital important; thus, capital supplied by someone other than the taxpayer may be considered, but the question is still whether such capital made a material contribution to income. Gaudern v. Commissioner,77 T.C. 1305 (1981); Moore v. Commissioner,supra;Gullion v. Commissioner,T.C. Memo. 1982-106; Treatman v. Commissioner,T.C. Memo. 1981-74. The manner of use of the capital is important. As the Court said in Edward P. Allison Company v. Commissioner,63 F.2d 553, 558 (8th Cir. 1933), affg. 22 B.T.A. 1371 (1931): The way in which capital makes its contribution is important. If utilized in the form of salaries, wages, office rent, etc., it does not make it a material income-producing factor, even though such expenditures are usually essential to the production of income * * *. When the use of capital goes further and gives character to a sizable portion of the operations of the corporation, the percentage *717 of gross income directly attributable to capital sources required to render capital a material income-producing factor need not be very great. Thus, if capital is simply employed as an adjunct to earning income which is fundamentally from the performance of personal services, making no separate significant contribution to gross income, it will not be considered material, even though the amount of capital employed may be considerable, section 1.1348-3(a)(3)(ii), Income Tax Regs., and even though a product may be involved. Tobey v. Commissioner,60 T.C. 227 (1973); United States v. Van Dyke,supra. In this context, capital employed in the use of auxiliary equipment, which is not income-producing in its own right, may be considered in the nature of "tools of the trade," where the income-producing activity is fundamentally one of providing skilled, specialized and essentially personal services, as in the case of the professional. Section 1.1348-3(a)(3)(ii); Cocks-Clark Engraving Co. v. Commissioner,8 B.T.A. 468 (1927); Innes-Behney Optical Co. v. Commissioner,7 B.T.A. 982 (1927); Rhoades, Brownson and Kampman v. Commissioner,2 B.T.A. 194 (1925). *718 With the above principles in mind, we turn to the facts of the present case. Petitiners argue earnestly that the equipment and materials used by the partnership in the conduct of its business and in the rendering of cleaning and painting services to Armco was not substantial, in relation to the volume of business done, and did not contribute materially to the income of the partnership. We think that the facts of the instant case not only do not support petitioners' position, but clearly indicate a contrary result.
We may agree with petitioners that in light of their gross receipts in the years in issue (over § 1,800,000 in 1976 and over $1,500,000 in 1977), the book value of their depreciable assets employed in the business was not impressively large (approximately $181,000 in 1976 and $202,000 in 1977). Such a comparison in this case, however, is misleading. As the stipulated facts show, Armco provided, at a cost to it of $80,000, a large piece of equipment for use by the partnership in its operations in the form of a vacuum truck in 1977. Armco also provided, at no cost to the partnership, parking spaces for partnership equipment, limited warehousing and garaging facilities, *719 space of the partnership's temporary mobile home office, and the sand, water, glass beads, painting supplies, paint, electricity, diesel fuel, cleaning supplies, compressed air and other miscellaneous supplies which the partnership used in performing work for Armco. The supply of such materials by Armco to the partnership reduced the latter's requirements for working capital which would otherwise have been necessary to purchase these necessary items, and is properly to be considered as capital employed in the partnership's business. Gaudern v. Commissioner,supra;Moore v. Commissioner,supra.We have no precise basis in this record for quantifying the amount of working capital which the partnership did not have to provide as the result of all these items being supplied gratis by Armco, but based upon the large use of such expendable items as paint, glass beads, sand and the like (as the stipulated facts show), we are satisfied that it was substantial, and, when added to the capital invested in depreciable assets which the partnership itself owned and employed in the business, we are clear on this record that substantial capital was employed *720 in the partnership business. Petitioners argue that the substantial amounts of capital, in the form of equipment and supplies, used by them in carrying on the partnership's trade or business should be likened to the auxiliary equipment or "tools of the trae" used by professional persons such as doctors and lawyers, whose income is derived from personal services which are the product of their special skills and training. In this, petitioners point to the allegedly complicated nature of some of the machines which were used, and the special training and skills which were necessary so that one could operate these machines properly. We find petitioners' arguments unconvincing. In the "tools of the trade" cases relied upon by petitioners, the capital involved contributed nothing substantial to the production of income; the capital was "of little or no value and [was] certainly not the thing for which the customers paid." Cocks-Clark Engraving Co. v. Commissioner,supra at 473. See also, Innes-Behney Optical Co. v. Commissioner,supra;Rhoades Brownson and Kampman v. Commissioner,supra.[7]
*721 Although, in the present case, we do not question that the petitiners' business acumen and skills, and their devotion to the business, resulted in a successful operation, it is clear that the equipment and materials used in their business cannot be characterized as "of little or no value and * * * not the things for which the customers paid." To the contrary, the machines and equipment contributed a separate, identifiable and substantial amount to the income of the business. In fact some charges were specifically allocable to the equipment itself. We therefore find petitioners' reliance upon these cases to be misplaced. The facts in the instant case present significant parallels to the facts which we faced in Nelson v. Commissioner,T.C. Memo. 1982-361. In that case, the taxpayer was a painting contractor. In addition to the usual materials, trucks and so forth employed in his business, the taxpayer had 20 sandblasting machines and 10 "porta-shot" machines which clean surfaces by blowing shot (instead of sand) against them. [8] Each "porta-shot" machine did the work of 12 men in cleaning. Such machines produced about 27% of the gross income from the painting *722 business. In that case we said: We do not consider as insignificant the fact that the use of the porta-shot blasting equipment produced almost 30% of the gross income of Nelson's Painting Service. Each machine that was used replaced the labor of 12 employees. Thus, these capital assets produced a substantial portion of the business gross income. In the instant case, the parties have stipulated, and we have found, that waterblasters, sandblasters, air compressors, pumps and vacuum trucks are all labor-saving devices, and without such equipment, the partnership would have had to employ substantially more employees so that the work performed could be done by hand. In the specific case of vacuum trucks, the use of the vacuum truck could do the same job with three men that 30 laborers would have to perform without the truck. After all is said and done, the ultimate and dispositive fact in this case, which the parties have stipulated, is that over 31% of the income of the partnership in each year was produced from materials charges and equipment rentals. Such amount *723 represents a material amount of income which was earned by capital, measured by any reasonable standard, cf. Rousku v. Commissioner,supra,Nelson v. Commissioner,supra, and we therefore have found that capital was a material income-producing factor in the operation of the partnership. [9] So finding, we hold for respondent on this issue. *724 Decision will be entered for the respondent in Docket No. 2902-81.
Decision will be entered under Rule 155 in Docket No. 2901-81.
Footnotes
1. Unless otherwise noted, all statutory references herein are to the Internal Revenue Code of 1954, as in effect in the years in issue; and all references to Rules are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioners Nancy J. Smith and Charlene Smith are involved herein only by reason of having filed joint returns with their respective husbands, and will not be referred to hereinafter.↩
3. The partnership returns, offered in evidence as joint exhibits, show somewhat different figures. We have adopted the figures stipulated by the parties, on the assumption that the difference represents adjustments to the book figures to which the parties have agreed.↩
4. The amounts and percentages are as stipulated by the parties. On brief (but not in their requested findings) petitioners complain that the figure for equipment and material for 1976 is distorted because it includes an amount of $124,021 for equipment which was rented and rebilled to Armco at cost, thus inflating the gross income figure and improperly raising the percentage of gross income attributable to equipment rentals. This claim cannot be verified from the record. If it was included in gross income, we would perforce assume that the same amount would be deducted as equipment rental expense, yet the entire amount of expense for all equipment rentals claimed in the partnership's 1976 return was only $123,212.12. A reasonable inference might be that it was omitted from both income and expense as a "wash" item. We further note that petitioners stipulated that the same proportion of 31.13% of 1977↩ partnership income represented receipts from equipment rentals and materials sales, a year in which petitioners make no such claims as they do for 1976. We accordingly leave the parties with their stipulated facts.
5. For the year 1976, the pertinent portions of section 1348 read as follows: SEC. 1348. FIFTY-PERCENT MAXIMUM RATE ON EARNED INCOME. (a) General Rule. -- If for any taxable year an individual has earned taxable income which exceeds the amount of taxable income specified in paragraph (1), the tax imposed by section 1 for such year shall, unless the taxpayer chooses the benefits of part I (relating to income averaging), be the sum of -- (1) the tax imposed by section 1 on the lowest amount of taxable income on which the rate of tax under section 1 exceeds 50 percent, (2) 50 percent of the amount by which his earned taxable income exceeds the lowest amount of taxable income on which the rate of tax under section 1 exceeds 50 percent, and (3) the excess of the tax computed under section 1 without regard to this section over the tax so computed with reference solely to his earned taxable income. (b) Definitions. -- For purposes of this section -- (1) earned income. -- The term "earned income" means any income which is earned income within the meaning of section 402(c)(2)(C) or section 911(b) * * *. Section 1348(b)(1)(A) was amended by section 302(a) of Pub. L. 94-455, 90 Stat. 1520, 1554 effective for taxable years beginning after December 31, 1976, by substituting "personal service income" for "earned income" where it first appears in said subsection. In the context of the present case, there is no substantive difference. Section 1348 was repealed in its entirety by section 101(c)(1) of Pub.L.97-34, 95 Stat. 172, 183, effective for taxable years beginning after December 31, 1981.↩
6. Pub. L. 95-600, sec. 442(a), 92 Stat. 2763, 2878, amended section 1348(b)(1)(A) by providing that the 30 percent ceiling limitation of sec. 911 (b) would not apply in the determination of reasonable compensation for personal services rendered by the taxpayer under sec. 1348, effective for years beginning after December 31, 1978.↩
7. These cases arose under section 200 of the Revenue Acts of 1918, 40 Stat. 1057 (Feb. 24, 1919), and 1921, 42 Stat. 227 (Nov. 23, 1921). Under these Acts, a "personal service corporation" was granted preferential tax treatment if certain requirements were met. One of these requirements was that capital not be a "material income-producing factor." Hence, petitioners' reliance upon these cases.↩
8. Compare these "porta-shot" machines to the blasters used in the instant case, where glass beads were used.↩
9. In Edward P. Allison Company v. Commissioner,supra, the Court pointed out that the materiality test was to be based upon gross income, i.e., gross profits after deducting the cost of goods sold. This is also specified in respondent's regulation, quoted above herein, and see Rousku v. Commissioner,supra.↩ In the instant case, however, the parties have made no point of this difference and have consistently treated the partnership's gross receipts as being the equivalent of gross income, apparently recognizing that the difference here is minor. In any case, petitioners have provided us with no basis for making any allocation of the "cost of goods sold and/or operations," as shown by the partnership returns, between gross receipts from labor and gross receipts from materials and equipment. We must accordingly leave the parties where we find them.