ALEX PILKINGTON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pilkington v. Commissioner
Docket No. 15740-79
United States Tax Court
T.C. Memo 1983-111; 1983 Tax Ct. Memo LEXIS 678; 45 T.C.M. (CCH) 814; T.C.M. (RIA) 83111; February 23, 1983. Ben L. Zarzaur and Henry B. Maring, for the petitioner. Katherine Weed, for the *680 respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's Federal income taxes for calendar years 1974, 1975, and 1976 in the amounts of $2,580.12, $5,438.13, and $1,510.86, respectively. Respondent also determined an addition to tax under section 6651(a)(1) [1] of $298.43 for calendar year 1974 and additions to tax under section 6653(a) of $129 and $271.91 for calendar years 1974 and 1975, respectively. The issues for decision are (1) whether capital was a material income-producing factor in petitioner's lounge businesses within the meanings of section 911(b) and section 1348 so as to cause a 30 percent limitation on the amount of petitioner's net profits to which the 50 percent maximum tax on earned income may apply; and (2) if so, whether petitioner is liable for additions to tax under section 6651(a)(1) and section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, Alex H. Pilkington, *681 who resided in Birmingham, Alabama, at the time of filing his petition in this case, filed his Federal income tax returns for calendar years 1974, 1975, and 1976 with the Internal Revenue Service Center at Chamblee, Georgia. Petitioner, who for approximately 20 years has operated bars and lounges in the Birmingham, Alabama, area, during 1974 owned and operated two lounges as sole proprietorships--the Gizmo Lounge (Gizmo) for 11 months and the Gold Torch Lounge (Gold) for 5 months. During the several months of 1974 that petitioner owned both lounges he dedicated his primary efforts and the majority of his time to Gold; he hired someone to bartend at Gizmo during the overlap period. Petitioner leased the buildings in which Gizmo and Gold were located. The total 1974 rental for Gizmo was $3,900 and for Gold was $3,250. Prior to yearend 1974, the Gold lease expired, and petitioner transferred to Gizmo the furnishings of Gold, including tables, chairs, glasses, etc. The Gizmo lease expired by December 31, 1974, and petitioner sold or abandoned the Gold furnishings. On April 1, 1975, petitioner opened Al's Cabaret Lounge (Al's). He operated Al's as a sole proprietorship from *682 April through December 1975, and for the entire 1976 calendar year. In 1975, at a price of $184,630, petitioner purchased the building and property in which he operated Al's and, at a cost of $42,272, he purchased new furniture and fixtures including tables, chairs, sinks, glasses, refrigeration equipment, air conditions, etc. During the years under consideration petitioner worked at his lounges approximately 15 hours daily. His major responsibilities included bartending, hiring and hiring his employees, procuring food for sale to customers, contracting bands, and supervising his employees. Petitioner's primary source of revenue came from the sale of beer and liquor; [2] he realized a lesser amount from the sale of sandwiches and other foods. Petitioner also realized some income from fees collected from customers for the usage of pool tables at the lounges and from admission charges of $1 to $2 per person collected on those nights that bands played at Gold's or at Al's. Petitioner's total gross receipts from these various sources were $218,929.97, $291,487.40 and $347,908 in 1974, 1975, and 1976, respectively. *683 Petitioner incurred significant costs in operating the lounges, including the cost of his beverage inventory. For the years in issue, petitioner's largest expenditures were as follows: COST OF GOODS
1974
1975
1976
Gold
Al's
Al's
Gizmo
Torch
Total
Cabaret
Cabaret
Beginning
inventory
$ 1,000.00
$ 1,500.00
$ 2,500.00
$12,200.00
Purchases
(Less cost of
items withdrawn for
personal use)
35,967.52
22,093.70
58,061.22
$62,305.75
74,783.00
Cost of labor
Materials and
supplies
Other costs
Total
$36,967.52
$23,593.70
$60,561.22
$62,305.75
$86,983.00
Less: Ending
inventory
500.00
500.00
12,200.00
8,682.00
Cost of goods
sold
$36,467.52
$23,593.70
$60,061.22
$50,105.75
$78,301.00
OTHER EXPENDITURES
Expenditure
1974
1975
1976
Salaries of bar attendants,
waitresses, cleanup crew, etc.
$21,584.35
$16,628.17
$25,409
Rental of pool tables and
equipment *
4,376.68
5,225
Insurance
82.50
4,534.00
6,463
Utilities
4,837.30
4,059.04
8,331
Liquor license and taxes
52,120.33
22,350.02
32,102
Supplies (glasses, etc.)
2,254.22
7,280.01
4,761
Contracting bands
7,555.10
59,270.55
96,286
Advertising
2,075.82
3,263.18
5,424
*684 Petitioner's net profits from his lounges, after taking business deductions, were $77,730.12, $96,477.42 and $58,835 for 1974, 1975 and 1976, respectively. His schedule of business assets was as follows: BOOK VALUE OF BUSINESS ASSETS
December 31, 1973
December 31, 1974
Assets
Assets
Cash in Bank--
(Check accounts)
$ 2,150.99 $ 1,036.34 Accounts Receivable
Inventory (Beer,
liquor and food)
2,500.00 500.00 Building, Improvements
and Land
Fixed Depreciable Assets: (Tables, chairs, sinks,
glasses, refrigerators,
air conditioners, etc.)
Gizmo
$31,789.00
$33,044.38
Gold
45,761.14
77,550.14 33,044.38 Al's
Total
82,201.13 34,580.72 Less: Accumulated
Depreciation: Gizmo
7,505.31
12,948.36
Gold
37,719.45
(45,224.76)
(12,948.36)
Al's
Total Book Value of
Assets
$36,976.37 $21,632,36 BOOK VALUE OF BUSINESS ASSETS
December 31, 1975
December 31, 1976
Assets
Assets
Cash in Bank--
(Check accounts)
$ 737.43 $ 200.00 Accounts Receivable
Inventory (Beer,
liquor and food)
12,200.00 8,682.00 Building, Improvements
and Land
* 184,630.00 185,148.00 Fixed Depreciable Assets: (Tables, chairs, sinks,
glasses, refrigerators,
air conditioners, etc.)
Gizmo
Gold
Al's
42,272.00 42,217.00 Total
239,839.43 236,247.00 Less: Accumulated
Depreciation: Gizmo
Gold
Al's
(10,515.15) ** (24,982.15)
Total Book Value of
Assets
$229,324.28 $211,264.85 *685 On his income tax returns for calendar years 1974, 1975 and 1976 petitioner utilized the 50 percent maximum tax on earned income and applied this maximum tax rate to the total net profits realized from his lounge businesses. In his statutory notice of deficiency, respondent adjusted the amount to which the maximum tax rate on earned income applied with the explanation that-- It is determined that capital is a material income-producing factor in your your business; therefore, your tax has been recomputed allowing only 30 percent of the net profits as earned income for purposes of the maximum tax computation. Income averaging was utilized in the computations for 1974 and 1975 as such method is more advantageous to you. OPINION Petitioner asserts that his entire 1974, 1975 and *686 1976 income from his lounge businesses was earned income within the meaning of section 1348. On the other hand, respondent contends that capital was a material income-producing factor in petitioner's lounge businesses and therefore a maximum of 30 percent of the income from his businesses may be considered earned income for purposes of section 1348. We agree with respondent. Section 1348 provides for a maximum marginal tax rate of 50 percent on earned taxable income. [3] Earned income for purposes of section 1348 means, inter alia, any income which is earned income within the meaning of section 401(c)(2)(C) or section 911(b). The controlling section in this case is section 911(b) which defines the term "earned income" as wages, salaries or professional fees and other amounts received as compensation for personal services and limits the portion of a proprietor's income that will qualify as such earned income where both personal services and capital are material income-producing factors. Section 911(b) states: (b) Definition of Earned Income.--For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation *687 for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producing factors, under regulations prescribed by the Secretary or his delegate, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income. The section 911(b) definition of earned income is amplified by section 1.1348-3(a)(3)(ii), Income Tax Regs., which provides: (ii) Whether capital is a material income-producing factor must be determined by reference to all the facts of each case. Capital is a material income-producing factor if a substantial portion of the gross income of the business is attributable to the employment of capital in the business, as reflected, for example, by a substantial *688 investment in inventories, plant, machinery, or other equipment. In general, capital is not a material income-producing factor where gross income of the business consists principally of fees, commissions, or other compensation for personal services performed by an individual. Thus, the practice of his profession by a doctor, dentist, lawyer, architect, or accountant will not, as such, be treated as a trade or business in which capital is a material income-producing factor even though the practitioner may have a substantial capital investment in professional equipment or in the physical plant constituting the office from which he conducts his practice since his capital investment is regarded as only incidental to his professional practice. This regulation has been cited with approval in numerous cases. See Gaudern v. Commissioner,77 T.C. 1305 (1981); Moore v. Commissioner,71 T.C. 533 (1979); Bruno v. Commissioner,71 T.C. 191 (1978). *689 Although we do not question that petitioner's personal services greatly contributed to the success of his lounges, this fact does not establish that capital was not a material income-producing factor. It is not uncommon for personal services and capital to be material income-producing factors in a single business. Gaudern v. Commissioner,supra at 1310. Whether capital is a material income-producing factor is a question to be determined from the facts and circumstances of each case. Bruno v. Commissioner,supra at 197; Rousku v. Commissioner,56 T.C. 548, 550 (1971). The basic test for determining whether capital is a material income-producing factor is the form of the income received and the nature of the business. Moore v. Commissioner, supra at 538; Rousku v. Commissioner,supra at 551. In those cases where capital has been determined to be a material income-producing factor, a substantial portion of the gross income of the business is attributable to the employment of capital in that business. For example, the courts have found capital to be a material income-producing factor *690 where the operation of the business has required substantial inventories or major investments in facilities, equipment, machinery, sales inventory, etc. E.g. Holland v. Commissioner,70 T.C. 1046, 1050 (1978), affd. 622 F.2d 95 (4th Cir. 1980). On the other hand, the courts have held capital not to be a material income-producing factor if the gross income from business has consisted primarily of fees, compensation, and commissions for personal services rendered, such as in the case of professional accountants, lawyers, and real estate brokers. [4] E.g. Miller v. Commissioner,51 T.C. 755, 759 (1969).
Petitioner takes the position that only a small portion of the income from his businesses is attributable to the utilization of capital. He argues that in any business a certain amount of capital must be utilized for purchasing business furnishings, paying office rent, or making mortgage payments on the place of business. Relying upon Edward P. Allison Co. v. Commissioner,63 F.2d 553 (8th Cir. 1933), affg. 22 B.T.A. 1371 (1931), *691 and Miller v. Commissioner,supra, petitioner labels such use of his capital as merely having been incidental to his businesses' operations rather than as having given character to a sizable portion of the operations of his businesses. Moreover, petitioner contends that the amount of capital employed in his inventory of beer, liquor and good was minimal, especially because his inventory turnover was rapid-approximately every 2 weeks. Petitioner states that he was required neither to tie up large sums of money in the inventory nor to furnish new capital with each replenishment of the inventory. It is clear from our reading of the Allison and Miller cases that there is no specific point at which capital becomes a material income-producing factor. Rather, it is the way in which capital makes its contribution to income that is important. Where capital is utilized solely to pay salaries, costs of renting or purchasing office space, and other such general business expenses, capital is not considered to be a material income-producing factor. Allison v. Commissioner,supra at 558; Miller v. Commissioner,supra at 759. *692 Yet, as a general rule, money of a business which is spent to purchase real property, to own a valuable leasehold interest, and to invest in depreciable assets and inventory, is considered capital in nature, and where such assets materially contribute to the production of income, capital is a material income-producing factor. Moore v. Commissioner,supra at 539; Rousku v. Commissioner,supra at 551; Fairfax Mutual Wood Products Co. v. Commissioner,5 T.C. 1279, 1282 (1945). In the instant case, the use of capital played a vital role in carrying on the lounge businesses. During 1974, petitioner held leasehold interests in the facilities in which Gold and Gizmo were located; in 1974, petitioner paid rent of $3,900 with respect to Gizmo and $3,250 with respect to Gold. In 1975, petitioner purchased for $184,630 the building and land in which he located Al's. Additionally, petitioner had a relatively large sum of money invested in the furnishings of his lounges, including tables, chairs, glasses, sinks, refrigeration equipment, air conditioners, etc. The book value of these depreciable assets from Gizmo was $31,789 at the *693 beginning of 1974 and $33,044.38 at the end of that year. The book value of petitioner's depreciable assets in Gold was $45,761.14 at the beginning of 1974 and zero at the end of that year because the fixtures and furnishings were either sold or abandoned. In 1975, petitioner purchased the furniture and fixtures for Al's at a cost of $42,272. Petitioner employed some of his capital in the purchase of inventory. For 1974, his beginning inventory was $2,500; he purchased $58,061.22 of beer, liquor and food during that year and his ending inventory was $500. For 1975, petitioner's beginning inventory for the operation of Al's was zero; he purchased $62,305.75 of inventory and his ending inventory for the year was $12,200.In 1976, in addition to the $12,200 of beginning inventory, petitioner purchased $74,783 of beer, liquor, and food; his ending inventory was $8,682. We consider these uses of capital to have been substantial in size and essential to the operation of petitioner's lounge businesses. Petitioner further argues that his lounge businesses were not traditional retail merchandising businesses and therefore capital should not be considered a material income-producing factor. *694 To support this contention, petitioner maintains that his customers did not purchase a tangible item to take home. We have no doubt that the lounge customers did not take home a tangible item. In fact, it is most likely that the customers consumed their purchases of drink and food at the lounges and we have assumed this to be the fact. However, the location at which business inventory is utilized or consumed by the customer is not a consideration in determining whether capital is a material income-producing factor and it does not convert the proceeds collected from the sale of inventory into personal services income. Petitioner next contends that his personal services to the lounges were principally responsible for the successes of the businesses, and, consequently, the entire net profits of the lounges should be considered personal services income. We are certain that petitioner's personal services were essential to the operation of the lounges. Petitioner's services included selecting and supervising employees, preparing food and drink for sale to customers, and listening to problems of drinking customers. These services were unquestionably one income-producing factor; however, *695 it does not follow that the lounges were personal service businesses. We view petitioner's services as inseparable from the food and drink inventory purchased and consumed by the customers. We are of the opinion that gross income of the lounge businesses came from the prices paid for the purchase of food and drink and not from any fees, commissions, or other compensation paid directly for personal services. See Moore v. Commissioner,supra at 539. [5]
Petitioner's expert witness testified that in comparison to other businesses for which he has performed accounting work, he would consider petitioner's investment of capital to have been minimal and not to have been a material income-producing item. Although undoubtedly the witness is a well-qualified accountant, we do not consider him qualified to address the legal question of whether capital was a material income-producing factor for purposes of section 1348. In fact, the witness admitted that he had no other clients in the business of operating a lounge and that most of his clients were professionals. Thus, although we consider *696 petitioner's witness credible in his testimony on the computation of petitioner's income, assets and expenses, we do not rely upon his interpretation of when capital is a material income-producing factor. On brief petitioner referred our attention to numerous cases which he considered as supportive of his position. Although we have not discussed all of these cases, we have reviewed and considered them. However, we have neither found them to be apposite to petitioner's circumstances nor to be helpful to his position. Because we have concluded that capital was a material income-producing factor in petitioner's lounge businesses in 1974, 1975, and 1976, petitioner is entitled to apply the 50 percent maximum tax rate of section 1348 only to 30 percent of the net profits realized during these years by his lounge businesses. Petitioner has conceded that if we find capital to have been a material income-producing factor in his lounge businesses, he is liable for the additions to tax under section 6651(a)(1) and section 6653(a) as determined by respondent. In accordance with our conclusion and petitioner's concession, Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
2. As required by Alabama law during the years in issue, petitioner purchased and sold liquor by the miniature bottle. Petitioner set the retail sales prices of the bottles at least five times higher than his purchase costs.↩
*. Petitioner rented the pool tables from a third party on a "share" basis. Petitioner charged and collected a fee from his customers for usage of the pool tables and remitted to the lessor his portion of the proceeds.↩
*. as stipulated. ** This accumulated depreciation figure is calculated from the information reported by petitioner on his tax returns. This amount exceeds the $24,726 in accumulated depreciation which petitioner stipulated was correct. We have been unable to determine the reason for the $256.16 difference in the two figures; however, this variance is not material to the outcome of the case.↩
3. Beginning after 1971, sec. 1348 provided: (a) General Rule.--If for any taxable year an individual has earned taxable income which exceeds the amount of taxable income specified in paragraph (1), the tax imposed by section 1 for such year shall, unless the taxpayer chooses the benefits of part I (relating to income averaging), be the sum of-- (1) the tax imposed by section 1 on the lowest amount of taxable income on which the rate of tax under section 1 exceeds 50 percent, (2) 50 percent of the amount by which his earned taxable income exceeds the lowest amount of taxable income on which the rate of tax under section 1 exceeds 50 percent, and (3) the excess of the tax computed under section 1 without regard to this section over the tax so computed with reference solely to his earned taxable income. (b) Definitions.--For purposes of this section-- (1) EARNED INCOME.--The term "earned income" means any income which is earned income within the meaning of section 401(c)(2)(C) or section 911(b), except that such term does not include any distribution to which section 72(m)(5), 402(a)(2), 402(e), or 403(a)(2)(A) applies or any deferred compensation within the meaning of section 404. * * * Pub. L. 94-455, sec. 302(a), 90 Stat. 1520,1554 (Oct. 4 1976), amended section 1348 for taxable years beginning after December 31, 1976. It provided, inter alia, that the maximum tax rate of 50 percent was retained although the term "earned income" was replaced by the more inclusive expression "personal service taxable income." This newer term meant any income within the meaning of sec. 401(c)(2)(C) or sec. 911 (b) or which is an amount received as a pension or annuity. The Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172,183, sec. 101(c)(1), repealed sec. 1348 effective for taxable years beginning after December 31, 1981.↩
4. Petitioner has conceded that he does not fall into the category of professionals.↩
5. See also Novikoff v. Commissioner,T.C. Memo. 1980-330↩.